**Hector Manuel SANTOS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–02–00354–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 23, 2003.

Alex G. Azzo, Houston, for appellant.

Lori DeAngelo Fix, Houston, for appellee.

Panel consists of Justices YATES, HUDSON and KEM THOMPSON FROST.

## OPINION

KEM THOMPSON FROST, Justice.

Appellant Hector Manuel Santos appeals his aggravated-robbery conviction, arguing in four issues that: (1)–(2) the trial court erroneously denied his motion to suppress in-court and out-of-court identification testimony after police used an impermissibly suggestive pretrial identification procedure; and (3)–(4) the evidence is legally and factually insufficient to prove appellant participated in the robbery. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The complainant, Jose Gonzalez, and about nine other men were socializing in the early morning hours at a one-bedroom apartment in southwest Houston. Several of the men were in the bedroom playing cards around a card table, while the others watched television and conversed in the living room. At approximately 2:00 or 2:30 in the morning, five armed men broke through the front door of the apartment. Their weapons included a handgun, a large gun that looked like an Uzi, and a machete or an ax. One of the intruders was wearing a mask over his face. The intruders ordered the occupants of the apartment to drop to the ground. They warned their victims not to look up at their faces unless they wanted to be shot. The intruders collected jewelry, money, and other possessions from the men, and then fled.

Luis Paz, one of the robbery victims, identified appellant as the intruder who carried the Uzi. Another victim also identified appellant. A jury found appellant

guilty of aggravated robbery and sentenced him to 99 years' confinement in the Texas Department of Criminal Justice, Institutional Division and imposed a $10,000 fine.

## II. ISSUES PRESENTED

Appellant presents four issues for review:

(1) Should the trial court have suppressed Luis Paz's out-of-court identification of appellant because it resulted from an allegedly unduly suggestive procedure?

(2) Should the trial court have suppressed Luis Paz's in-court identification of appellant because it was tainted by an allegedly unduly suggestive pretrial identification procedure?

(3)–(4) Is the evidence legally and factually insufficient to support appellant's aggravated-robbery conviction when the complainant's testimony incriminating appellant was not credible?

## III. ANALYSIS AND DISCUSSION

### A. Did an unduly suggestive pretrial identification procedure render a witness's in-court identification inadmissible?

■ In his second issue, appellant argues the trial court should have suppressed Paz's in-court identification because it was tainted by the identification procedure appellant claims was unduly suggestive. An in-court identification is inadmissible if it has been tainted by an impermissibly suggestive pretrial identification procedure. *Ibarra v. State,* 11 S.W.3d 189, 195 (Tex.Crim.App.1999). We perform a two-step analysis to determine whether the trial court erroneously admitted in-court identification testimony, in-

quiring: (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification at trial. *Delk v. State,* 855 S.W.2d 700, 706 (Tex.Crim.App.1993). It is appellant's burden to prove the in-court identification is unreliable by proving both of these elements by clear and convincing evidence. *See id.* If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, the identification testimony is admissible. *Id.*

### 1. Suggestiveness of the Home Video

■ We must first determine whether the pretrial lineup procedure used with Paz was impermissibly suggestive. Paz tentatively identified appellant as one of the robbers in a videotaped lineup. After Paz made this tentative identification, police showed him a home video found in appellant's car. After viewing this video, Paz was able to positively identify appellant. Appellant argues this procedure was unduly suggestive because appellant is the only person who appears in both the videotaped lineup and the home video. Appellant maintains this procedure communicated to Paz that police thought appellant was one of the robbers. Having carefully reviewed both tapes, we conclude this pretrial identification procedure was impermissibly suggestive.

■ The manner or the content of a pretrial identification procedure may render it impermissibly suggestive. *See Barley v. State,* 906 S.W.2d 27, 33 (Tex.Crim. App.1995). Though it may be necessary in some circumstances to show a witness more than one photograph of a defendant who has "different looks," it is generally considered suggestive to show a witness several photographic arrays or lineups in which only the defendant's photograph re-

curs. *See Cantu v. State*, 738 S.W.2d 249, 252 (Tex.Crim.App.1987). The recurrence of the defendant's photograph tends to bring attention to him and might suggest to the witness that police believe or suspect the defendant is the culprit. *See id.* Similarly, "the use of a lone photograph, without any of the traditional safeguards of a lineup or a photographic array, is inherently suspect" and has been widely condemned by courts. *Loserth v. State*, 985 S.W.2d 536, 543 (Tex.App.-San Antonio 1998, pet. ref'd).

In the instant case, Paz first viewed a videotaped lineup featuring appellant and four other dark-complected young men. The lineup was filmed at the Harris County Jail. Appellant stood in the second position. To keep appellant from standing out because of his braided hair, all of the lineup participants wore shower caps. Paz told police the person in the second position on the tape (appellant) looked like one of the robbers, but he was not certain. Police then showed Paz the videotape found in appellant's car when appellant was arrested approximately two weeks after the robbery.

Appellant is the only person who appears in both the videotaped lineup and the home video found in appellant's car. The running time of the home video is approximately thirty-five minutes and it has low-quality sound, which was turned down when Paz viewed the tape. The home video prominently features appellant and contains seven distinct scenes ranging in duration from approximately one to seven minutes each. Although Paz viewed the entire tape, he positively identified appellant as one of the robbers during the opening scene in which appellant is shown browsing in the shoe department of a store. The opening scene lasts about six minutes and appellant is wearing dark blue jeans, a navy blue shirt, conspicuous gold earrings, a thick gold chain, and other jewelry. The scene includes several close-up shots of appellant and he is the only person shown until a store clerk approaches him about three minutes into the tape.

In the second scene of the home video, which lasts about four minutes, appellant and a dark-complected male companion make a purchase at a liquor store and then walk to appellant's car. Appellant and his companion apparently took turns filming each other because they never both appear on the film at the same time. Like appellant, the companion has braided hair and is wearing jeans and a navy blue shirt, but the companion has a lighter complexion than appellant. Once inside the car, only appellant is shown. During about thirty seconds of footage in the car, appellant removes a handgun from the glove compartment, shows it to the camera, and then gestures with it.

The third segment of the home video lasts about four minutes and shows appellant and the same companion at a drug store. Appellant is shown interacting with a clerk at the photograph counter. During the last two minutes of this scene, appellant is behind the counter with the clerk until the clerk motions for appellant to return to the customer area.

The fourth scene is also approximately four minutes long and it shows only appellant and traffic footage. In this scene, appellant is shown driving and then drinking from a liquor bottle. He also is shown dancing and talking to the camera.

The fifth scene lasts about one minute. It shows the same male companion entering a large clothing store and looking around.

The sixth scene consists of about seven minutes of footage, filmed at night in a parking lot near a gas station. About six

men are sitting on cars, standing around, and drinking what appears to be beer. Appellant arrives approximately three minutes into the scene. Appellant talks to the camera and there are several close-up shots of him. At one point, one of the other men, wearing a white shirt, removes a gun from the trunk of one of the cars and briefly shows it to the camera. Due to the poor lighting, it is unclear from the tape whether the man in the white shirt is appellant's companion from the previous scenes.

The seventh scene is about three minutes long and features appellant sitting on a couch next to another young, dark-complected man. There is a young woman reclining on an adjacent couch and the scene alternates between close-up shots of appellant and close-up shots of the young woman. After the final scene, there is additional footage, apparently filmed at very close range, showing a music video that was playing on a television screen. After the music video, there is brief footage of small children playing basketball inside a gymnasium.

We find the home video was unduly suggestive. *See Cantu,* 738 S.W.2d at 252. Though the police may have believed it necessary to show Paz a second image of appellant because the shower cap rendered it difficult to recognize him in the police video lineup, the means selected brought attention to appellant and might have suggested to Paz that the police believed appellant to be the culprit. Appellant is the only person from the police video lineup who is also in the home video, and appellant is featured prominently throughout the home video. In some scenes, appellant's actions might suggest he is a criminal or a gangster. Showing Paz the home video, after he tentatively identified appellant in the police video lineup, was at least equivalent to showing Paz a lone photo-

graph of appellant or a series of lineups in which only appellant's photograph recurred. Accordingly, we conclude the identification procedure was unduly suggestive.

### 2. Reliability of In–Court Identification

 Having determined the pretrial identification procedure was impermissibly suggestive, we now perform the second step of the analysis and determine whether the procedure rendered Paz's identification unreliable under the totality of the circumstances. In conducting this analysis, we must weigh the corrupting effect of the impermissibly suggestive pretrial lineup procedure against the following factors to determine whether the in-court identification is admissible:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of the witness's prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the time of the confrontation;

(5) and the lapse of time between the alleged act and the time of the confrontation.

*Ibarra v. State,* 11 S.W.3d at 195. This list of factors is not exhaustive, so we may also consider the following additional factors:

(1) any identification prior to the lineup of another person;

(2) the identification by photograph of the defendant prior to the lineup; and

(3) any failure to identify the defendant on a prior occasion.

*Barley,* 906 S.W.2d at 35, n. 8; *Brown v. State,* 29 S.W.3d 251, 254–55 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Be-

cause all of these factors are issues of historical fact, we weigh them deferentially in a light favorable to the trial court's ruling. *See Ibarra,* 11 S.W.3d at 195–96. We then weigh the factors, viewed in this light, de novo "against the 'corrupting effect' of the suggestive identification itself." *Id.*

The violent intrusion and subsequent robbery occurred very quickly. Nonetheless, the record shows Paz had sufficient opportunity to observe the intruder who was carrying the Uzi. Paz was standing in the bedroom doorway looking toward the front door of the apartment when the intruders kicked down the front door. The bedroom door was across the living room from the front door, separated by a distance of about eight feet. Because the intruders had to cross the living room before reaching the bedroom, the witnesses in the bedroom had a greater opportunity to view them than the witnesses in the living room whom the intruders immediately told to drop to the ground. One of the intruders held a handgun to Paz's head and told him to drop to the floor unless he wanted to be shot. Out of surprise, Paz froze for a moment and ignored the intruder's instruction. In this moment, a second intruder, whom Paz later would identify as appellant, entered the bedroom area wielding a large automatic weapon that Paz described as an Uzi. The intruder with the Uzi was approximately three feet away from Paz, and Paz dropped to the ground at the sight of him.

Although Paz was not able to observe the Uzi-armed intruder for an extended period of time, he was attentive enough to provide a height estimate of 5'10″ for the police. At trial, Officer Ebers of the Houston Police Department testified that appellant is that precise height, which supports the reliability of Paz's identification. *See Delk,* 855 S.W.2d at 706 (finding identification reliable when witness saw robber in his car at four-way traffic stop for about fifteen seconds and stating length of encounter is relevant consideration but not controlling); *Brown,* 29 S.W.3d at 255 (finding identification reliable when entire burglary lasted less than a minute and eyewitness saw intruder's face for only a few seconds). In his trial testimony, Paz also recounted that the intruders argued with one man who begged them not to take his wedding band. Ultimately, the intruders did not take the band because the man could not remove it from his finger. Paz's ability to recount this exchange between the robbers and one of the men shows Paz's high degree of attention at the time of the robbery.

The record does not show any discrepancy between Paz's pre-identification description of the Uzi-armed intruder and appellant's description. The only arguable discrepancy would be that Paz described the robbers as speaking with a Columbian accent, but appellant testified he was born in Puerto Rico and moved to the continental United States approximately twelve years before trial.[1] This slight discrepancy does not rise to the level that would weigh against a finding of reliability because the record suggests appellant is actually Columbian. Officer Pedro Moreno of the Houston Police Department testified that, in an unsolicited conversation, appellant told Moreno he was from Columbia and did not want to return to Columbia.

Paz's certainty regarding his in-court identification can be inferred from how Paz reacted to seeing appellant in the court-

---

1. The record does not indicate whether appellant moved to the continental United States directly from Puerto Rico.

room during trial. Paz testified it was difficult for him to look in appellant's direction in the courtroom because it caused him to remember the night of the robbery and to feel rattled. The record does not show that Paz failed to identify appellant as one of the robbers on any occasion prior to viewing the home video. Nor does the record show that Paz previously identified any other person as the Uzi-armed intruder. Rather, when Paz viewed the videotaped lineup of five men wearing shower caps, Paz tentatively identified appellant as the intruder who brandished the Uzi. Moreover, Paz made his in-court identification of appellant thirteen months after the robbery and testified his identification in this case was based on what he saw at the time of the robbery. *Id.* (identification admissible if ability to identify has independent origin from pretrial procedure). This relatively short lapse between the robbery and the time of the in-court identification, Paz's consistent testimony, and Paz's lack of difficulty in remembering the robbery events, are additional indicia that his in-court identification of appellant was reliable. *See, e.g., Delk,* 855 S.W.2d at 705–08 (finding eighteen-month time span between robbery and in-court identification did not undermine reliability because witness remembered details and provided consistent testimony).

Weighing this evidence of reliability against the unduly suggestive home video shown to Paz before his positive identification of appellant, we conclude no substantial risk of irreparable misidentification was created so as to deny appellant due process. *See Ibarra,* 11 S.W.3d at 195–96; *Delk,* 855 S.W.2d at 706. Accordingly, we find the trial court did not abuse its discretion by allowing Paz's in-court identification. Therefore, we overrule appellant's second issue.

## B. Did an unduly suggestive pretrial identification procedure render testimony about a witness's out-of-court identification inadmissible?

 In his first issue, appellant argues the trial court should have suppressed testimony regarding Paz's out-of-court identification of appellant because it resulted from the same unduly suggestive pretrial identification procedure. In determining the admissibility of the out-of-court identification, the cases indicate that we apply a nearly identical two-step analysis, inquiring: (1) whether the pretrial identification procedure was impermissibly suggestive, measuring suggestiveness by the same criteria as is used in the in-court identification context; and (2) if the pretrial procedure was impermissibly suggestive, whether it gave rise to a very substantial likelihood of misidentification. *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). In analyzing the second prong, we apply the same reliability factors used to assess the reliability of in-court identifications. *See Barley,* 906 S.W.2d at 35, n. 8; *Brown,* 29 S.W.3d at 254–55.

 For the reasons set forth above, the pretrial identification procedure was impermissibly suggestive. In making the requisite assessment under the second prong, we find the application of the factors to the out-of-court identification differs in only two respects from our application of the factors to the in-court identification—(1) the level of certainty demonstrated at the time of the confrontation and (2) the lapse of time between the robbery and the confrontation. Accordingly, in weighing the reliability of the out-of-court identification, we disregard Paz's certainty at trial that was manifested by his unease when he looked in appellant's direction in the courtroom. Paz made a tentative identification of ap-

pellant when he saw him in the video lineup. Paz and Officer Ebers both testified Paz was certain of his identification of appellant when he viewed the home video later the same day. Officer Ebers, who had observed Paz while Paz watched the home video, testified that within the first three minutes of the tape, Paz began shaking his head as though he recognized appellant. Paz informed Officer Ebers that appellant was definitely one of the intruders.[2] The out-of-court identification took place only 35 days after the robbery, and Paz had not been shown other images of appellant during the intervening time period. *See Ibarra,* 11 S.W.3d at 196.

Weighing this evidence of reliability against the unduly suggestive pretrial identification procedure, we conclude the procedure did not give rise to a very substantial likelihood of misidentification so as to deny appellant due process. Accordingly, we find the trial court did not abuse its discretion by failing to suppress Paz's out-of-court identification. Therefore, we overrule appellant's first issue.

## C. Is the evidence legally and factually sufficient to prove appellant was one of the robbers?

In his third and fourth issues, appellant challenges the legal and factual sufficiency of the evidence to support his conviction, arguing the identification testimony of the complainant named in the indictment, Jose Gonzalez, was not credible. Appellant makes the same arguments in support of both of his sufficiency issues. He contends the evidence is legally and factually insufficient to prove appellant was even present during the robbery, citing the following four reasons: (1) a week before trial Gonzalez allegedly told appellant's private in-

vestigator he was uncertain that appellant was one of the robbers; (2) there is no fingerprint evidence linking appellant to the offense; (3) Miguel Hernandez witnessed the robbery, but could not identify anyone as a participant in the robbery; and (4) appellant testified at trial and denied any involvement in this robbery.

### 1. Sufficiency Standards of Review

In evaluating a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App. 2000). We may not overturn the jury's verdict unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State,* 819 S.W.2d 839, 846 (Tex. Crim.App.1991). The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex.Crim.App.1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Crim.App.1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim.App.1997). The question is not whether a rational jury could have entertained a reasonable doubt of guilt, but whether it necessarily would have done so. *Swearingen v. State,* 101 S.W.3d 89, 96 (Tex.Crim.App.2003).

When evaluating a challenge to the factual sufficiency of the evidence, we

---

**2.** Paz viewed the remainder of the home video and later told Officer Ebers he believed one of the other men in a scene closer to the end of the home video also might have been one of the intruders.

view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Johnson v. State,* 23 S.W.3d 1, 6–7 (Tex.Crim.App.2000). This concept embraces both "formulations utilized in civil jurisprudence, i.e., that evidence can be factually insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence." *Id.* at 11. Under this formulation, we essentially compare the evidence which tends to prove the existence of a fact with the evidence that tends to disprove that fact. *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996). In conducting the factual-sufficiency review, we must employ appropriate deference so that we do not substitute our judgment for that of the fact finder. *Id.* at 648. Our evaluation should not intrude upon the fact finder's role as the sole judge of the weight and credibility given to any witness's testimony. *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). In conducting a factual sufficiency review, we must consider and address the appellant's main argument for a finding of insufficiency. *Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003). This practice benefits the parties, maintains the integrity of the justice system, and improves appellate practice. *Id.* We find the evidence factually insufficient only when necessary to prevent manifest injustice. *Cain,* 958 S.W.2d at 407.

### 2. Sufficiency Analysis

■ A person commits the felony offense of aggravated robbery when: (1) in the course of committing theft; (2) with intent to obtain and maintain control of property; (3) he knowingly or intentionally; (4) threatens or places another in fear of imminent bodily injury or death; and (5) then and there uses or exhibits a deadly weapon. *See* TEX. PEN.CODE §§ 29.02(a)(2), 29.03(a)(2); *see also Robinson v. State,* 596 S.W.2d 130, 132 (Tex. Crim.App.1980). Because the jury was charged on the law of parties, it could have reached its verdict by deciding the other robbers committed the elements of the offense and appellant, acting with intent to promote or assist the commission of the aggravated robbery, solicited, encouraged, directed, aided, or attempted to aid the others to commit the robbery. *See* TEX. PEN.CODE § 7.02(a).

■ After thoroughly reviewing the evidence, we conclude that a rational trier of fact could have found appellant guilty beyond a reasonable doubt. Eyewitness testimony and circumstantial evidence showed appellant was one of the five intruders who forcibly entered the apartment where Gonzalez, Paz, and others were socializing. The evidence shows that appellant, wielding a large gun that looked like an Uzi, entered the bedroom of the apartment. The occupants of the bedroom were told to drop to the ground, and they were robbed of their money, jewelry, and other possessions. The robbers told the occupants not to look at them unless they wanted to be shot and then stripped of their clothing. Paz and Gonzalez both testified that they feared they would be killed.

Gonzalez was inside the bedroom when the robbery took place. About two weeks before Paz identified appellant, Gonzalez positively identified appellant after viewing him in the lineup conducted at the Harris County Jail.[3] Like Paz, Gonzalez identified appellant as the intruder who entered

---

**3.** Gonzalez viewed the live lineup of which Paz was shown a videotape.

the bedroom with a large black gun that looked like an Uzi. Both Paz and Gonzalez testified that appellant was not wearing a mask or anything else to conceal his face. Police admonished both Gonzalez and Paz before viewing the lineup, that the persons in the lineup may or may not have been involved in the robbery. Gonzalez and Paz were also admonished not to discuss with any other person the identifications, if any, they made. The record does not contain any evidence that Gonzalez or Paz disregarded these instructions.

Circumstantial evidence relating to the guns used in the robbery corroborated the identification testimony and pointed to appellant's guilt. Gonzalez testified that the handgun held to his head was black and had a square shape. He also told police that he saw a gray car speed away after the robbery, but admitted he was uncertain of the color because he saw the car only briefly and in a dark parking lot. Appellant was arrested about two weeks after the robbery. Police officers pursued appellant because he was speeding in a silver sedan that had recently sustained damage and had smoke coming out of its hood. At the time of the stop, appellant was intoxicated and tried to escape from police by running away on foot. He was arrested at a nearby apartment complex. Police seized a loaded nine-millimeter handgun that was in plain view on the passenger-side floor board of appellant's car. This handgun matches the gun Gonzalez described.

Three eyewitnesses described the robbers' complexions and accents, giving very similar accounts. Appellant's accent matches the description provided by other eyewitnesses, even though Gonzalez and Paz did not hear appellant's voice when they identified him as one of the robbers. According to Gonzalez's testimony, the robbers spoke Spanish with a Columbian or Puerto Rican accent. Miguel Hernandez, who was in the living room when the robbery occurred, and Paz testified that the robbers spoke Spanish with a Columbian accent. Appellant's native language is Spanish, and as discussed above in the identification analysis, the record suggests appellant is from Columbia even though he testified he was born in Puerto Rico. Moreover, Hernandez, Gonzalez, and Paz all testified that the robbers had dark, cinnamon color complexions. Appellant's complexion matches this description.

After appellant's arrest, police searched his apartment and found a cellular phone that belonged to Hernandez. Hernandez testified that the robbers took his cellular phone in the heist. Hernandez identified the cellular phone found in appellant's possession as his (Hernandez's) cellular phone. The custodian of records for Voicestream Wireless also testified at trial that he traced the serial number of the cellular phone and found that it did indeed belong to Hernandez. When asked about the cellular phone at trial, appellant failed to provide a coherent explanation for his possession of it. Appellant first testified that he found Hernandez's phone at a party about a week after the robbery occurred. Later, he testified he found the phone outside a bar and that it had been "thrown out."

After reviewing the record under the applicable standard, we conclude that the alleged shortcomings in the evidence do not render it legally insufficient to support appellant's conviction. Appellant contends the evidence is legally insufficient because Gonzalez allegedly admitted to John Castillo, a licensed private investigator hired by the defense, that he was not certain appellant was one of the robbers. Castillo spoke with Gonzalez on the telephone about a week before trial, after Castillo's efforts to obtain Gonzalez's physical ad-

dress proved unsuccessful. Castillo testified that he asked Gonzalez questions about his identification of appellant in this case, and that Gonzalez repeatedly said he was unsure of the identification he made. According to Castillo, Gonzalez was uncertain because at the time of the robbery he had consumed five or six beers and had been awake for a long period of time. Castillo further testified that Gonzalez had told the police he was uncertain when he identified appellant, but that Gonzalez was afraid to clearly voice his uncertainty to the police.

On cross-examination, Castillo conceded a complainant, like Gonzalez, could be startled when contacted on behalf of the defendant. Gonzalez testified he was surprised when Castillo called him because he had made efforts to keep his phone number confidential. According to Gonzalez, Castillo asked him a couple of questions very quickly and then abruptly ended the conversation. Gonzalez admitted once on cross-examination that he told Castillo he was uncertain. However, Gonzalez also testified several times on cross-examination and direct examination that he was certain of his pretrial identification of appellant.

Appellant also urges the evidence is legally insufficient because there was no fingerprint evidence linking appellant to the robbery, and because Hernandez could not identify anyone as a participant in the robbery. These arguments lack merit because a rational jury could have found the elements of the offense beyond a reasonable doubt without fingerprint evidence and without identification testimony from Hernandez. Three police officers testified as to their unsuccessful efforts to obtain fingerprint evidence from the apartment after the robbery. Officer Walter Stairhime, a latent-fingerprints examiner for the Houston Police Department, explained

that in most cases, fingerprint evidence is inconclusive. Stairhime explained that contrary to television portrayals of fingerprint testing, a print is not left every time someone touches an object. For example, no prints are left on a surface when a person's hands are particularly dry. Conversely, Stairhime explained, a print that is too moist is usually smeared and therefore not useful. In this case, Stairhime explained the police were unable to obtain fingerprint evidence left by any of the robbers. On appellant's reasoning, this would mean no one was present at the robbery. However, as Stairhime explained, the absence of a person's fingerprints at a crime scene does not prove the absence of the person from the crime scene.

Likewise, Hernandez's inability to identify appellant, or any of the other robbers, hardly proves appellant did not participate in the robbery. Hernandez was in the living room when the robbery occurred. The front door of the apartment opened directly into the living room. Consequently, those in the living room had less opportunity to view the intruders than those in the bedroom, because the intruders immediately instructed the living room occupants to drop to the ground and not look at them. Hernandez testified that he was unable to identify any of the intruders because he dropped to the ground immediately and heeded their instructions to remain on the ground without looking at their faces.

Finally, appellant argues the evidence is legally insufficient because he testified he was not involved in the robbery. Appellant did not offer an alibi, and was impeached, on cross-examination, with four prior inconsistent statements he had given to the police. It was the jury's duty to resolve conflicting evidence in this case. *See Anderson v. State,* 701 S.W.2d 868,

872–73 (Tex.Crim.App.1985); *see also Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex.Crim.App.1995) ("Reconciliation of conflicts in the evidence is within the exclusive province of the jury."). The jury had before it all of the relevant information concerning the identification of appellant, and, as fact finder, the jury had the duty to determine the credibility of the witnesses' testimony and to decide the weight to be given the evidence. *See Garza v. State*, 633 S.W.2d 508, 514 (Tex. Crim.App.1981) (opin. on reh'g); *see also Carr v. State*, 694 S.W.2d 123, 128 (Tex. App.-Houston [14th Dist.] 1985, pet. ref'd). Whether considered alone or in conjunction with appellant's other arguments for legal insufficiency, appellant's testimony did not render it impossible for a rational trier of fact to find appellant committed aggravated robbery either alone, or as a party to the offense. *See McDuff*, 939 S.W.2d at 614; *Davis v. State*, 831 S.W.2d 839, 842 (Tex.App.-Dallas 1992, pet. ref'd). Therefore, we find the evidence is legally sufficient to sustain appellant's aggravated-robbery conviction. Accordingly, we overrule appellant's third issue.

Applying the factual-sufficiency standard of review, we cannot conclude the jury's verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Johnson*, 23 S.W.3d at 6–7. Accordingly, we overrule appellant's fourth issue as well.

## IV. Conclusion

Although the home video the police showed to Paz was impermissibly suggestive, the trial court did not err by admitting Paz's in-court and out-of-court identification testimony because the totality of the circumstances showed the unduly suggestive pretrial procedure did not give rise to a very substantial likelihood of misidentification. Finally, because we find the testimony of two eyewitnesses and the circumstantial evidence in this case were sufficient to establish appellant's guilt, we overrule appellant's challenges to the legal and factual sufficiency of the evidence. We affirm the trial court's judgment.