**Affirmed and Memorandum Opinion filed June 26, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-00399-CR

_____

## ALTON PAUL ALEXANDER, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1278561**

## MEMORANDUM OPINION

Appellant, Alton Paul Alexander was convicted of aggravated robbery with a deadly weapon and sentenced to forty years in prison. In his sole issue, he argues that the trial court erred in denying four motions to suppress four in-court identifications. Because any impermissibly suggestive pretrial identification procedures did not give rise to a substantial likelihood of an irreparable in-court misidentification of appellant, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Jonathan ("Jon") and Jan Caldwell lived in the Heights neighborhood of Houston, Texas, where they hosted a tenant, Gary Scott Reif, in an apartment above their garage. On September 3, 2010, the Caldwells arrived home at around 11:00 p.m. after celebrating Jan's birthday with friends. They started to pack their car for a trip they intended to take the next day. Reif, who is friendly with the Caldwells, announced that he would take a dog he was watching for a short walk around the block before enjoying a birthday drink with Jon and Jan. As he neared the end of his walk and turned back on to the Caldwells' street, Reif sensed a car slow down behind him before suddenly speeding down the street. Moments later, Reif saw a man approaching in the darkness. As the man approached, Reif noticed a second and third man trailing the first. The lead man passed Reif, who quickly found himself surrounded as two of the men pulled out guns. In the street lights, Reif could clearly identify appellant as one of the trailing men. The men demanded Reif's wallet. When Reif told them he had not brought a wallet, the men forced him to walk down the street to their parked car and to get inside. With appellant driving, the men demanded to know where Reif lived and what valuables he had inside his home. Reif directed them to the Caldwells' residence.

Outside their garage, the Caldwells were packing their car for Jan's birthday trip when they noticed that their electric gate was partially opening and closing repeatedly, as if someone unfamiliar with the opening device was trying to open the gate. The Caldwells looked up and saw a car outside the gate with its lights on. At the same time, they saw the dog Reif had been walking running up behind the car, dragging its leash behind it. Although the Caldwells were suspicious, they thought the visitors might be friends of Reif's, and Jan opened the gate. When the gate opened, a man emerged from the driver's seat of the car and approached the Caldwells. At first, Jon could not make out the man's face as he approached against the backdrop of the bright lights. Soon, however, the man entered a well-lit area to the side of the garage, and the car's lights no longer obscured his

2

face. Jon and Jan both unequivocally identified him as appellant. According to Jon, appellant's face was "well lit up" and there were "[n]o more than four or five feet between us at any time." Jon extended his hand and introduced himself. Appellant, his face fully visible, conversed with the Caldwells for about five minutes. Appellant told the Caldwells that Reif owed him $500 and he had come to collect it. Jan became suspicious and demanded to see Reif. Appellant pulled out a gun, grabbed Jan from behind, and put his gun against Jan's neck. Appellant demanded the Caldwells' money. Jon gave appellant $70 in a money clip and told him that was all he had, but appellant was not satisfied and demanded that Jon lead them inside. In the living room, Jan gave appellant all the cash she had in her purse, as well as a gold necklace. Jon went into the bedroom and found his wallet, which contained about $300, and told appellant that that was all the money he had for Jan's birthday trip. Appellant took this, along with Jon's driver's license and debit card. In total, appellant stole a little over $400 in cash from the Caldwells. After forcing the Caldwells to accompany him back outside the house, appellant told them not to call the police or he "would fuck [them] up." Appellant then fled to his waiting car and directed the other men to let Reif go. As Reif ran to a neighbor's home, the Caldwells called the police. When appellant's car failed to start, the three men got out of the car and fled on foot. The police arrived minutes later and took descriptions of appellant. Jon described appellant as "an average clean-cut kid . . . about my size, less heavy, and 30 years younger." He also told the police appellant was black.

While the Caldwells were being robbed, James Harper was eating dinner at a restaurant down the street called Andy's. Andy's is a popular gathering place for police officers at the end of their shifts. When Harper left the restaurant, he saw three black males approaching him in the parking lot, which was very well lit. As the men approached, several police cars sped past Andy's in the direction of the Caldwells' home. Harper noticed that the men hid as the police cars passed. One of the three men, whom Harper identified as appellant, approached Harper and demanded his car keys. After initially refusing, Harper complied. The restaurant manager noticed what was happening

3

and alerted the officers inside. Officer David Gonzalez ran outside as appellant pulled out of the lot in Harper's car. Officer Gonzalez ran out into street and called for appellant to stop. There was some road work on the street outside Andy's, and much of the street was blocked off with barrels. Whether to hit Officer Gonzalez or to avoid the barrels, appellant turned his car toward Officer Gonzalez and, according to Officer Gonzalez, drove directly at him. Officer Gonzalez fired a shot at the car, which swerved away and sped down the road.

Officer Juan Carlos Montelongo was on his way due east to the Caldwells when he saw appellant driving southbound in Harper's car. Although Officer Montelongo was unaware of the events at Andy's, he noticed that appellant's lights were off and that onlookers were pointing at the car and yelling. Disregarding his dispatch orders, Officer Montelongo turned and followed appellant, signaling with full lights and sirens for appellant to stop. Appellant refused to do so, and a lengthy chase ensued through the streets of midtown Houston. It ended when appellant crashed into a pole, fled on foot, and was tackled by two police officers in the parking lot of a pharmacy a few miles from Andy's. The police found Jon's driver's license and debit card and $420 in cash, folded over as if it had been held in place by a money clip.

As the police interviewed them outside their home, the Caldwells and Reif could hear police officers discussing the chase over the patrol car radios. When they heard that the police had recovered Jon's driver's license and debit card, they suspected that the driver was one of the three men who had kidnapped Reif, but not necessarily the man who had robbed the Caldwells. The police brought appellant to the Caldwells' home and asked the Caldwells and Reif if they could identify him. Thirty to ninety minutes had elapsed since the robbery. Appellant was seated inside a patrol car, his face visible in the car's dome lights. When Jon, Jan, and Reif saw appellant, each identified appellant instantly and unequivocally as the man who had robbed them that night.

4

Appellant was charged with aggravated robbery with a deadly weapon as to Reif[1] and with the aggravated assault of a public servant as to Officer Gonzalez. Before trial, appellant moved to suppress all photographic, live lineup, and show-up identifications on the basis that "the procedures utilized were impermissibly suggestive . . ." and "[t]here [was] a substantial likelihood of misidentification of [appellant] at trial as a result of the impermissible procedure." No suppression hearing was held before trial and no order on this motion appears in the record. Before Jon, Jan, and Reif identified appellant in court, appellant objected to their in-court identifications and the trial court held separate hearings outside the presence of the jury. At the hearings, each of the three witnesses testified consistently with the factual recitation above. The trial court admitted each witness's in-court identification. The jury convicted appellant of the aggravated robbery charge and acquitted him of the aggravated assault charge.

At the punishment phase of trial, the State introduced evidence of an extraneous offense involving another aggravated robbery that took place a few hours before[2] appellant robbed the Caldwells. Michelle Denson testified that on September 3, 2010, at about 10:30 p.m., a man entered the garage of her home in Humble, Texas and demanded her purse at gunpoint. The man blocked her from escaping by standing between her car and a refrigerator in her garage. As Denson struggled for control of her purse, she stood no more than two feet away from the assailant. Denson's garage was well lit and she was able to see the man's face clearly. In court, Denson identified appellant as the man who robbed her. The robber stole Denson's purse and fled in a dark colored car.

A few days later, the Caldwells called the police to report having found a number of Denson's credit cards, her debit card, her AARP card, and her Sam's Club card in their house. Officer Carrie Farquhar, a robbery investigator with the Houston Police

---

[1] For reasons unclear from the record, appellant was not charged with the aggravated robbery of the Caldwells.

[2] The Caldwell robbery took place in the early morning hours of September 4.

5

Department, asked Denson to view a photospread including appellant and five other black males. Farquhar told Denson that the perpetrator might not be included in the photospread and she should not feel obligated to pick anyone. Denson tentatively identified appellant as the man who robbed her. She told Officer Farquhar, "I feel like it was him, he was really dark like that and the way he looks feels like it was him."[3] Despite Denson's requests, Officer Farquhar refused to tell Denson whether she had identified the man linked with the recovery of the stolen contents of her purse.

A week or ten days later, Officer Farquhar called Denson and asked her to come to police headquarters for a live lineup. She again told Denson that her assailant might not be included in the lineup. Appellant was the only suspect common to both the photographic array and the live lineup. When she saw appellant, Denson began to cry as she instantly recognized him as the man who had robbed her. After checking her height against appellant's, Denson identified appellant, "without a doubt," as her attacker. The police later discovered that appellant's fingerprints had been left on Denson's car the night she was robbed in her garage. At trial, appellant objected to Denson's in-court identification, and the trial denied his motion after a hearing outside the jury's presence. Denson and Officer Farquhar, however, both testified without objection that Denson identified appellant as her robber at the live lineup.

After hearing the evidence and arguments of counsel, the jury sentenced appellant to forty years in prison. In his sole issue, appellant argues that the trial court erred in failing to suppress the four in-court identifications of appellant—Jon's, Jan's, Reif's, and Denson's.

## II. ANALYSIS

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We view the evidence in

---

[3] Appellant's is one of the two darkest faces in the array; the other face, unlike appellant's, is tattooed and illuminated by a glare.

the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). Because the trial court observes the demeanor and appearance of the witnesses, the trial court is the "sole trier of fact and judge of the credibility of witnesses and the weight to be given to their testimony." *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When reviewing a trial court's denial of a motion to suppress, we afford almost total deference to the trial court's express or implied determination of historical facts, while reviewing the court's application of the law to the facts de novo. *Wiede*, 214 S.W.3d at 25. We will sustain the trial court's ruling if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 85, 857 (Tex. Crim. App. 2003) (citing *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002)).

Appellant argues that the trial court erred in failing to suppress the four in-court identifications because (1) the out-of-court identification procedures were impermissibly suggestive, and (2) those procedures gave rise to a substantial likelihood that the four witnesses would misidentify appellant in court. "[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). We apply a two-step analysis to determine the admissibility of an in-court identification (1) whether the pretrial identification procedure was impermissibly suggestive, and, if so, (2) whether that suggestive procedure gave rise to a substantial likelihood of an irreparable in-court misidentification. *Id.* An appellant must establish both of these elements by clear and convincing evidence. *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (citing *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993)). We examine the totality of the circumstances to determine the reliability of the identification. *Conner*, 67 S.W.3d at 200. "If the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed

'reliable,' reliability [being] the linchpin in determining the admissibility of identification testimony." *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999) (citations and internal quotations omitted).

Appellant points to four facts that he argues made the Caldwells' and Reif's identification procedures impermissibly suggestive: (1) appellant was brought to the crime scene without any other suspects, constituting "an unnecessary one-man confrontation;" (2) the Caldwells and Reif were not given cautionary instructions before making their identifications; (3) the Caldwells and Reif heard over the police radio that appellant had been arrested with Jon's license and debit card, contaminating them with this knowledge when appellant was brought back to the scene for identification; and (4) the Caldwells and Reif were shown appellant at the same time, such that "[o]ne of the witnesses would necessarily have to have spoken up first with their identification, thus suggesting to the others that [appellant] was the robber." With respect to Denson, appellant argues that "the subjects in the initial photospread were flawed in their arrangement so as to influence Ms. Denson to select the photo of [appellant]."

Even assuming, without deciding, that the pretrial identification procedures used in this case were impermissibly suggestive, appellant has failed to show by clear and convincing evidence that they gave rise to a substantial likelihood of irreparable in-court misidentification. Factors we consider when determining whether there is a substantial likelihood of misidentification include: (a) the witness's opportunity to view the perpetrator at the time of the offense; (b) the witness's degree of attention during the offense; (c) the accuracy of the witness's prior description of the perpetrator; (d) the witness's level of certainty regarding her identification at the time of confrontation; and (e) the lapse of time between the offense and the subsequent confrontation. *See Santos*, 116 S.W.3d at 453 (citing *Ibarra*, 11 S.W.3d at 195). We consider these issues of historical fact in the light most favorable to the trial court's ruling, then weigh them de novo against the "corrupting effect" of the suggestive pretrial identification procedure. *Id.* at 453–54

8

(citing *Ibarra*, 11 S.W.3d at 195–96).

Reif testified that appellant's face was fully visible in the streetlights when appellant approached Reif and that Reif could see appellant's face in the headlights as appellant returned to the car after robbing the Caldwells. The Caldwells testified that appellant's face was "well lit up" throughout his five-minute conversation with the Caldwells and that he was within arm's reach, with "[n]o more than four or five feet between us at any time." The Caldwells were with appellant inside their home for several more minutes, during which Jon had additional opportunities to view appellant in full lighting. Jon described appellant's actions and expressions while inside the house in some detail. He recalled, for example, which hand appellant held his gun in and noted that appellant "started acting agitated, like he wanted to hurry up and get the heck out of the house." The record does not indicate how accurate Jon's description of appellant was, except as to appellant's race. With respect to the lapse of time between the offense and the subsequent confrontation, Jon was "pretty sure it was less than an hour" before appellant was brought back to the Caldwells' home. Jan thought it was "an hour, hour and a half" but not more. Jon, Jan, and Reif were all very certain of their identifications. Jon testified that he was "[one h]undred percent sure" about his identification of appellant that night. Jan told the jury that she was "[a]bsolutely" certain when she saw appellant and that the identification took her a "[s]plit second." Reif similarly testified that the identification "[d]idn't take long at all. Pretty obvious who it was." In court, each witness similarly identified appellant with great certainty and professed to have no hesitation or doubt about his or her identification. Denson had a similar opportunity to view appellant up close. As she struggled for her purse, Denson stood no more than two feet away from appellant. Denson's garage was well lit and she was able to see appellant's face clearly. Denson's initial identification of appellant in a photo array was tentative, but she testified that at the live lineup 7–10 days later, she recognized appellant as soon as he walked in the room and had "[n]o doubt in [her] mind" that he was the man who had robbed her. Officer Farquhar described Denson's identification at the live line up as "absolutely, positively, without a doubt. She

9

was certain that was the person who robbed her."

Taking the trial court's evaluation of the facts and witnesses in the light most favorable to the trial court's ruling, we conclude that any impermissibly suggestive procedure in this case did not create a substantial likelihood of misidentification at trial. The trial court therefore did not abuse its discretion in allowing the Caldwells, Reif, and Denson to identify appellant at trial. We overrule appellant's sole issue on appeal and affirm the trial court's judgment.

### III. CONCLUSION

Because any impermissibly suggestive procedure in this case did not create a substantial likelihood of misidentification at trial, we conclude that the trial court did not abuse its discretion in admitting the four contested in-court identifications. We affirm the trial court's judgment.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Seymore, Brown, and Christopher.

Do Not Publish — TEX. R. APP. P. 47.2(b).