# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00355-CR

**Martell Damon Rector, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 70200, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Martell Damon Rector guilty of robbery and assessed a punishment of ten years in prison. *See* Tex. Penal Code § 29.02. He contends that the trial court abused its discretion by admitting evidence of a pretrial identification because it was impermissibly suggestive and by allowing an in-court identification because it was tainted by the improper pretrial identification procedure. We will affirm the judgment.

## BACKGROUND

Josh Meyer was working as a clerk at a convenience store when two men entered the store at around 2:45 a.m. One man—wearing a black "do-rag" on his head and no shirt—stood by the front door while the other walked through the store asking Meyer questions. Meyer said that his main concern was the man walking around the store, who Meyer believed was planning to steal merchandise. He said he recognized the man at the door from previous visits to the store, but not the other man. Suddenly, the shirtless man at the door grabbed a metal rack containing

a classified-advertisement publication and threw it across the counter at Meyer. It missed, but the same man then threw a cardboard candy rack, which hit Meyer. The men then left, and Meyer threw his broom at them. Meyer said that the shirtless man returned, yelling threats, and jumped over the counter and shoved Meyer using a "wet floor" safety cone. Meyer said that the shirtless man then grabbed Newport menthol cigarettes and fled east. Meyer reported that the robbery occurred shortly after 2:48 a.m.

Meyer stated that about thirty minutes thereafter, frequent customer Derrasette Mitchell entered the store. He said she usually visits twice a night, and this was her second visit. After learning of the robbery, Mitchell viewed the footage from the security cameras.[1] Mitchell testified that she identified the shirtless man as appellant, whom she said she had known for almost ten years because he lived near her for a while and continued to visit his child in the neighborhood. She also said appellant was her boyfriend's cousin and lived with their grandfather about two blocks from the convenience store. Mitchell testified that she had seen appellant standing outside the store at about 2:40 a.m. He asked her for a cigarette, but she did not have one. She said they both smoked Newport cigarettes. She testified that appellant was wearing dark jeans, a shirt, and a black do-rag. When she returned to the store about forty-five minutes later, it was in disarray, and Meyer told her he had been robbed. She said she recognized appellant from the various angles of the video. She said that she recognized his face, the do-rag, and the pants, though she noted that he was no longer wearing a shirt. She said she had no doubt that appellant was the robber in the video.

---

[1] There was a discrepancy about who initiated the viewing. Meyer said that Mitchell volunteered, but Mitchell testified that the store manager asked her to review it.

Meyer testified that within two weeks of the robbery, a police officer left a black-and-white photo at the store. Meyer testified that he recognized the man in the photo as his attacker, appellant. Meyer testified that a police officer later showed him a photo array that contained a color photo from what appeared to be the same time period as the black-and-white photo he had seen at the store. Meyer gave the detective a statement regarding the assault in which he provided greater detail about his attacker's appearance than he had on the night of the attack, but the police officer who showed him the array testified that it was not clear whether Meyer recalled the details from the robbery or from seeing the photo. In the statement, Meyer wrote that a coworker nicknamed Queenie also watched the video and identified appellant as the robber. Meyer testified that his ability to identify appellant in the photo array and in court was based on his observations during the robbery, not due to the photo left at the store.

A Baylor University professor of psychology and neuroscience testified that eyewitness testimony is sometimes unreliable. Although he did not opine regarding any particular witness's credibility, he asserted that the provision of appellant's photo to the convenience store "hopelessly compromised" the identification process by suggesting that appellant was the robber. He also suggested that Meyer's identification of appellant was tainted by his contact with Mitchell and Queenie during or after their identification of appellant from the video. The professor also asserted that the women should not have been shown the video because they did not witness the robbery itself.

## DISCUSSION

Appellant contends that Meyer's identification of him was tainted because Meyer was shown a photo of appellant in isolation and after others identified appellant as the robber. He contends that the trial court abused its discretion by admitting evidence of an impermissibly suggestive pretrial identification procedure and that the trial court abused its discretion by admitting in-court identification testimony tainted by the impermissibly suggestive pretrial identification procedure, both of which gave rise to a substantial likelihood of misidentification.

**Standard of review**

Determining the admissibility of an in-court identification when a defendant contends that suggestive pretrial identification procedures tainted identification is a two-step process. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995); *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). We typically first determine if the pretrial identification procedure was impermissibly suggestive. *Barley*, 906 S.W.2d at 33; *Santos*, 116 S.W.3d at 451. If we conclude that it was, we then determine if the defendant showed by clear and convincing evidence that the impermissibly suggestive nature of the pre-trial lineup gave rise to a substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33; *Santos*, 116 S.W.3d at 451. If the totality of the circumstances indicates that a substantial likelihood of irreparable misidentification exists, admission of the identification of the defendant amounts to a denial of due process. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972). On the other hand, where the totality of the circumstances shows no substantial likelihood of misidentification, the identification testimony would nevertheless be admissible. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

If we conclude that the identification procedures gave rise to a substantial likelihood of misidentification, we must assess whether appellant was harmed. If the identification procedures violated his right to due process, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Such constitutional error is harmless if there is "overwhelming" untainted evidence to support the conviction. *Harrington v. California*, 395 U.S. 250, 254 (1969); *see Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We do not focus on the propriety of the outcome, but calculate, to the degree possible, the probable impact of the error on the conviction in light of the existence of other evidence. *Wesbrook*, 29 S.W.3d at 119. We examine the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at its verdict—that is, whether the error adversely affected the integrity of the process leading to the conviction. *See Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

**The pretrial identification procedures did not give rise to a substantial likelihood of irreparable misidentification**

Presuming for the sake of analysis that the pretrial identification procedures used in this case were impermissibly suggestive,[2] appellant has failed to show by clear and convincing evidence that these procedures gave rise to a substantial likelihood of irreparable misidentification. Factors that we consider when determining whether there is a substantial likelihood of

---

[2] Implying that a suspect is included in a photo array is improperly suggestive. *Ibarra v. State*, 11 S.W.3d 189, 196 (Tex. Crim. App. 1999). Letting Meyer see the black-and-white photo provided to the store with the message that anyone who knows the man in the photo should call Temple Police likely had such a suggestive effect.

misidentification include: (1) the witness's opportunity to view the perpetrator at the time of the offense, (2) the witness's degree of attention during the offense, (3) the accuracy of the witness's prior description of the perpetrator, (4) the witness's level of certainty regarding his identification at the time of confrontation; and (5) the lapse of time between the offense and the subsequent confrontation. *See Santos*, 116 S.W.3d at 453 (citing *Ibarra*, 11 S.W.3d at 195). We consider these issues of historical fact in the light most favorable to the trial court's ruling, then weigh them de novo against the "corrupting effect" of the suggestive pretrial identification procedure. *Id*. at 453-54 (citing *Ibarra*, 11 S.W.3d at 195-96).

Meyer testified that he saw the robber standing at the door for a while before the assault began, and recognized him as an occasional customer. The robber threw two objects from fairly close range, then leapt over the counter and pushed Meyer with a cone, causing Meyer to see him at very close quarters. While Meyer said his primary focus was initially on the other man in the store, his attention shifted when the robber began throwing display racks at him. Meyer's initial description to police (black male, about 6'0 tall, weighing about 185 pounds) was consistent with appellant (black male, 5'10 tall, weighing 170 pounds). Meyer's later provision of additional specifics does not diminish the accuracy of his initial description. Meyer stated that, when he first saw the lone photo of appellant at the store a week or so after the robbery, he knew it was the man who robbed him. When he saw the photo array ten days after the robbery, he selected appellant's photo with what he described as "99.8 percent" certainty, diminished only by the fact that appellant wore a shirt in the picture; he said he remembered the robber's muscle definition and body features, which he was not able to compare with the photo. Meyer noted that the photo in the array was a

6

color photo and appeared to be "from the same time period" as the black-and-white photo he had seen at the store.

The main risk of allowing a witness to see a single photo of a person who resembles the offender is that the witness is "apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons v. United States*, 390 U.S. 377, 383-84 (1968); *see also Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993). Here, however, we conclude that Meyer's familiarity with appellant, coupled with his opportunity to see the robber at close range before and during the robbery, outweigh any corrupting effect of letting Meyer see the lone photo of appellant. We conclude that the totality of the circumstances show that any problems with the pretrial identification procedures did not lead to a substantial likelihood of misidentification. The trial court did not abuse its discretion by admitting evidence of Meyer's pretrial identification of appellant, nor in permitting Meyer to identify appellant in court.

**Any error was harmless**

Even if Meyer's identification of appellant was tainted, he was not the only person to identify appellant. His coworker, Queenie, identified appellant as the robber from the video, as did Mitchell, who also identified appellant in court. Mitchell said she had known him for ten years and noted that they both smoked Newport cigarettes. Although Mitchell did not see the robbery, she testified that she saw appellant at the scene minutes before it occurred and said that he asked her for a cigarette. She identified him as the robber in the video less than an hour later. The robber, who took only Newport cigarettes from the store, disappeared quickly on foot, and Mitchell testified that appellant lived nearby. Finally, the jury saw the video and saw appellant in court.

We conclude that any error in the admission of Meyer's identifications of appellant as the robber did not contribute to appellant's conviction.

**CONCLUSION**

We affirm the judgment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 26, 2014

Do Not Publish