**Opinion issued July 11, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-10-00615-CR

_____

## CLIFFORD JAMES GRATTON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 339th District Court
### Harris County, Texas
### Trial Court Case No. 1231782

---

## MEMORANDUM OPINION

A jury convicted appellant, Clifford Gratton, of the offense of capital

murder.[1]    Because the State did not seek the death penalty, the trial court

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (Vernon Supp. 2012) (providing that person commits capital murder when he murders more than one person during same criminal transaction).

automatically assessed punishment at confinement for life. In two issues, appellant contends that (1) the State failed to present sufficient evidence of identity and (2) the trial court abused its discretion when it required his alibi witness to testify in jail clothing without making any findings of fact or conclusions of law concerning this decision.

We affirm.

## Background

In May 2007, Joseph Brown lived near the corner of Fondren and the Southwest Freeway, by the Arena Towers, in southwest Houston. Around 7:30 or 8:00 p.m. on May 11, 2007, Brown was standing in the doorway of his garage talking on his cell phone. Across the street, Brown saw a car stopped at the intersection of Fondren and the driveway from the Arena Towers, waiting to turn left onto Fondren. Brown then saw a person run from behind a nearby fence to the car and shoot into the front passenger window of the car. The shooter then ran back behind the fence. The car rolled across two lanes of Fondren and stopped at the grassy median. Brown called 9-1-1. He then saw a man, later identified as John Wells, climb out of the rear driver's side door, "stagger" across Fondren to a parking lot, and collapse. Brown walked over to the car and saw a passenger, later identified as Demonceon Coleman, sitting motionless and the driver, later identified as Ralph Houston, "gasping for breath." Coleman and Houston both

2

died of multiple gunshot wounds. Brown testified that "[a]ll [he] saw [of the shooter] was a person with black clothing, and [he] couldn't even see skin or the face." It appeared to Brown that the shooter was wearing a hood and something to cover his face.

Kenya Hutchins testified that he was walking into a business on Fondren with two friends, Tiara Warren and Lashanda Reid, when he heard a loud bang followed a few seconds later by a series of several bangs. Hutchins ducked into the store and waited for several seconds before looking outside. Hutchins started walking toward Fondren. As he did so, he saw a car moving at a crawl toward the median, where it stopped. Hutchins then saw Wells climb out of the rear driver's side door of the car. Wells, holding both of his sides, hobbled across Fondren. Hutchins and his friends helped Wells over to the front of a nail salon. The only thing he heard Wells say to them was, "Please don't let me die." Hutchins brought towels out from the nail salon to try to stop Wells from bleeding. Hutchins left Wells with Reid, who was trying to bandage him, and he went back over to the car to check on its occupants.

Lashanda Reid testified in a prior proceeding in this case. Because she was unavailable to testify at the trial that is the subject of this appeal, her prior testimony was read into the record. Reid stated that she was standing in front of a business when she heard gunshots. Reid turned in the direction of the gunshots

3

and saw a "flash" and a "figure." Reid recalled telling the police in her statement that she saw the shooter and that she could tell the shooter was a man. She told the police that the man was "dark-skinned," and she clarified in her testimony that she meant that the man was African-American. She stated that the shooter was too far away for her to be able to tell what his actual complexion was. Reid also spoke with Wells, who appeared in shock, as she was assisting him. Reid testified that she asked Wells if he knew who shot him, and Wells responded, "No."

John Wells testified that he met Coleman and Houston when they started working for a company called Bargain Network, which had its office in the Arena Towers, in early 2007. Wells, Coleman, and Houston were part of a training group that met in the afternoon. The three of them became friends, and they would carpool home after work. Appellant had also recently started working at Bargain Network and was attending the morning training session. Appellant and Coleman knew each other from high school, and, occasionally, as appellant was leaving training for the day and Coleman was beginning, appellant would pass by Coleman's work station and call him derogatory names. At work on the day of the shooting, appellant walked over to Coleman and started talking to him. The conversation turned into an argument, during which appellant again called Coleman derogatory names. Appellant then told Coleman, "Meet me outside," and, as he was walking away, appellant said, "I got you."

4

Around 8:00 p.m., Wells, Coleman, and Houston left work in Houston's car. They were sitting at an intersection waiting to turn onto Fondren when Wells heard a "big bang." Wells, who was sitting in the back seat of the car, ducked down. He looked over and saw appellant, who was wearing a black hooded sweatshirt and something covering his mouth, standing at the front passenger window and shooting into the car. Wells tried to reach for the gun and open the car door, and as he did this, he was shot as well. After appellant stopped shooting, he said to Coleman, "I told you I'd get you." Wells recognized the voice as appellant's. Appellant then ran over to a car that was parked nearby and left the scene.

After appellant left, Wells managed to get out of the car and go to a nearby parking lot. Wells remembered speaking to a woman in the parking lot, but he did not remember her asking who shot him. When asked by the prosecutor if he knew, at that point in time, who had shot him, Wells responded, "Yes."

Wells spoke to the police twice at the hospital. The first time, he told the officer that "[a] guy at work" had shot him, because he did not know appellant's name. The second time, two days later, Wells viewed three photo-arrays. He did not identify anyone in the first photo-array, but he did identify appellant in the second photo-array. When asked who he was identifying, Wells responded, "I was identifying a person who shot me." Wells stated that he "knew exactly who shot [him]." Wells later gave a recorded statement to police, in which he described

5

what had happened earlier in the day at work and what had happened in the car. He again identified appellant as the shooter.

Lauren Philmon also worked at Bargain Network. She testified that she was in the same training group as Coleman, Houston, and Wells, which met in the afternoon. She testified that she had seen appellant at work and that he was part of the morning training group. She stated that, on the day of the shooting, appellant and Coleman started arguing while at work. She heard appellant tell Coleman that he "would be waiting for them after work." She stated that neither appellant nor Coleman was belligerent during this altercation, but she could tell from their attitudes and their tone of voice that they did not like each other.

Houston Police Department ("HPD") Sergeant J. Roberts was assigned to investigate the shooting. Sergeant Roberts testified that after he assisted in processing the scene he saw John Wells at Ben Taub Hospital. Wells was heavily sedated at the time, so Sergeant Roberts had only a brief conversation with him before Wells went into surgery. After this conversation, Sergeant Roberts received a telephone tip from Shelly Houston, Ralph Houston's sister, and she gave him the names of three potential suspects, including appellant. Sergeant Roberts obtained a photograph of appellant, and another homicide investigator prepared three photo-arrays, each one containing a picture of one of the possible suspects Shelly Houston had named. Sergeant Roberts then visited Wells in the hospital on May

6

13, 2007, and showed him the photo-arrays.[2] The first and third photo-arrays did not contain a picture of appellant, and Wells did not identify anyone in these arrays. The second photo-array contained appellant's picture, and Wells pointed to appellant's picture and "identified him as Cliff who works with them at Bargain Network and also as the person who shot them." Sergeant Roberts testified that Wells "immediately" pointed to appellant's picture and that, when asked whether he was sure about his identification, Wells responded, "Yes." Sergeant Roberts was not able to speak with Wells about the details of the shooting at that time because Wells was still too weak from surgery, but Roberts interviewed Wells approximately two weeks later.

Appellant called Demarco Coleman, who was not related to the complainant Demonceon Coleman, as an alibi witness. At the time of the trial, Demarco was incarcerated on an unrelated offense and was dressed in the orange jumpsuit of the Harris County Jail. Before defense counsel called Demarco, he objected to requiring Demarco to testify in his jail clothes. Counsel stated:

> We believe that the fact that [Demarco is] in an orange jumpsuit and clearly known to be in custody would be—would create an impression of untruthfulness and would take away from the witness' testimony. I feel like if he could be dressed in street clothing, he would be put on equal footing with all other witnesses that have appeared so far, Your Honor.

---

[2] Sergeant Roberts attempted to speak with Wells on May 12, 2007, but Wells was still unconscious after surgery.

7

The trial court stated, "That ruling is denied." On direct-examination of Demarco, defense counsel called attention to his attire, and Demarco testified that he was currently in custody. He stated that he had previously been convicted of burglary of a habitation and that he had violated the terms of his probation, leading to his present incarceration.

Demarco testified that he arrived at appellant's apartment between 5:30 and 6:00 p.m. on May 11, 2007, and that he remained at the apartment for the entire evening. About four hours after he arrived, Demarco received text messages concerning the shooting. Demarco testified that appellant was at the apartment when he arrived and that appellant did not leave the apartment before he received the text messages concerning the shooting.

Appellant testified on his own behalf. Appellant acknowledged that he and Demonceon Coleman were affiliated with rival gangs. He agreed that he had a conversation with Houston and Coleman on the day of the shooting, but he stated that he never threatened anyone during the course of that conversation. Appellant testified that he took a bus home from work and arrived back at his apartment around 4:30 or 5:00 p.m. He testified that he did not go back to the Arena Towers area that night; rather, he stayed at his apartment the entire evening. He stated that he later found out about the shooting via text message. Appellant testified that he

has never owned or carried a gun, and he denied shooting Coleman, Houston, and Wells.

Appellant testified that, the night after the shooting, he and one of his friends were asleep in his apartment when two men broke into the apartment and accused appellant of being involved in the shooting. Appellant responded that he was not involved in the shooting. In response, the men forced appellant and his friend out of the apartment. The men tried to force appellant and his friend into the trunk of a car and threatened to kill them. Appellant testified that he then ran away. The men shot at appellant, but he escaped unharmed. The next day, appellant left Houston to stay with his father in Chicago.

Ultimately, the jury found appellant guilty of capital murder, and the trial court automatically assessed his punishment at confinement for life. *See* TEX. PENAL CODE ANN. § 12.31(a)(2) (Vernon 2011).

## Sufficiency of the Evidence

In his second issue, Appellant contends that the State failed to present sufficient evidence that he was the one who shot Coleman and Houston.[3]

---

[3] Appellant also contends that his conviction was contrary to the overwhelming weight of the evidence, and he cites law relevant to factual sufficiency challenges. In *Brooks v. State*, the Court of Criminal Appeals overruled *Clewis v. State* and its progeny and held that evidence is to be reviewed solely under the sufficiency standard described in *Jackson v. Virginia*. 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) ("[W]e decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to

9

## A. *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's determinations of credibility. *See Lancon v. State*, 253

---

support each element . . . beyond a reasonable doubt."); *Ervin v. State*, 331 S.W.3d 49, 52–54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (construing majority holding in *Brooks*).

S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

### B. Capital Murder

To establish that appellant committed capital murder, the State was required to prove that appellant intentionally and knowingly caused the death of Demonceon Coleman and Ralph Houston by shooting them with a deadly weapon, namely, a firearm, during the same criminal transaction. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2011), 19.03(a)(7)(A) (Vernon Supp. 2012). The State must prove, beyond a reasonable doubt, that the accused is the person who committed the charged crime. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). Identity may be proved by direct or circumstantial evidence, and it may be proved by inferences. *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Roberson*, 16 S.W.3d at 167. Direct and circumstantial evidence are equally probative, and proof by circumstantial evidence is not subject to a more rigorous standard than proof by direct evidence.

11

*Roberson*, 16 S.W.3d at 167 (citing *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989)); *see also Clayton*, 235 S.W.3d at 778 ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.").

Positive identification of a defendant by a victim of the crime is sufficient to establish the defendant's identity as the perpetrator. *See Kesaria v. State*, 148 S.W.3d 634, 641 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 189 S.W.3d 279 (Tex. Crim. App. 2006); *see also Williams v. State*, 34 S.W.3d 587, 590 (Tex. App.—Eastland 2000, pet. ref'd) (holding eyewitnesses' identification of defendant sufficient to establish identity even though defendant disputed eyewitnesses' identifications); *Davis v. State*, 831 S.W.2d 839, 842 (Tex. App.—Dallas 1992, pet. ref'd) (holding victim's identification of defendant sufficient even though defendant presented five witnesses who testified he was in another state at time of offense). The victim's positive, unequivocal in-court identification of the defendant as the perpetrator is also sufficient to establish identity. *See Jones v. State*, 687 S.W.2d 430, 432 (Tex. App.—Houston [14th Dist.] 1985, no pet.). The inability of other eyewitnesses to the offense to identify the defendant does not prove that the defendant did not commit the offense. *See Santos v. State*, 116 S.W.3d 447, 459 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005,

12

pet. ref'd) ("[The complainant's identification] testimony standing alone is sufficient to support appellant's conviction.").

John Wells testified that appellant had had verbal altercations at work with Demonceon Coleman, in which appellant called Coleman derogatory names. On the day of the shooting, appellant approached Coleman at work and started arguing with him, and, at the end of the conversation, appellant said "Meet me outside" and "I got you" to Coleman. Wells testified that, later that evening, while he, Coleman, and Houston were waiting in Houston's car at an intersection, he heard a "big bang" and ducked down in the back seat of the car. Wells saw appellant standing at the window and shooting inside the car. Wells testified that, during the shooting, appellant said, "I told you I'd get you." Wells recognized appellant's voice.

The first time Wells spoke to the police, he did not know appellant's name, so he told Sergeant Roberts that "[a] guy at work" shot him. The next time Wells spoke to Sergeant Roberts, he looked at three photo-arrays. He testified that a picture of the "person who shot [him]" was not contained in the first photo-array, but it was contained in the second photo-array. When asked how much doubt he had when he pointed out appellant's picture in the photo-array, Wells responded, "I knew exactly who shot me." In a later interview, after he had been discharged from the hospital, Wells provided details of the incident at work and the shooting,

13

and he again identified appellant as the shooter. Wells also identified appellant in court as the shooter.

Sergeant Roberts testified that the second photo-array that he showed to Wells contained a picture of appellant, and Wells pointed to appellant's picture, identified him as "Cliff" from work, and stated that he was the person who shot him. Wells looked at all of the pictures in the photo-array and then immediately pointed to appellant's picture. When asked if he was sure about his identification, Wells responded "Yes." This identification occurred on May 13, 2007, two days after the shooting, because this was the first time that Sergeant Roberts stopped by when Wells was awake and coherent enough after surgery to view the photo-arrays.[4] Wells' identification of appellant as the shooter, both from a photo-array and in court, is sufficient to establish appellant's identity as the perpetrator of the charged offense. *See Kesaria*, 148 S.W.3d at 641; *Jones*, 687 S.W.2d at 432.

As further evidence of identity, the State presented Lauren Philmon's testimony that appellant and Coleman had a confrontation at work the day of the shooting. She heard appellant tell Coleman that he "would be waiting for them after work." Philmon testified that appellant and Coleman were not belligerent during this conversation, but she could tell from their attitudes and their tone of

---

[4]    Contrary to appellant's assertion, there is no indication that Wells' delayed identification of appellant was at all connected to appellant's attempted kidnapping by associates of Coleman or Houston on May 12, 2007.

14

voice that they did not like each other. Appellant, testifying on his own behalf, acknowledged that he and Coleman were affiliated with rival gangs.

In contending that the evidence was not sufficient to establish identity, appellant points to Lashanda Reid's testimony from a prior proceeding that, as Wells was lying in front of the nail salon, she asked him who had shot him and he stated that he didn't know. Wells testified that he did not remember Reid asking him this question, and he agreed with the prosecutor that "at that point" in time, he knew who had shot him. Appellant also pointed to the testimony of triage nurse Theresa Thomas, who testified that when Wells arrived at Ben Taub she asked him what had happened and he said that the gunshots came from another vehicle. Wells did not recall telling a nurse at Ben Taub that the gunshots had come from another vehicle, and he affirmatively testified that that was an inaccurate description of what had happened at the scene.

Appellant also points out that, in her statement to police, Reid stated that the shooter was dark-skinned, "a description that does not match the Appellant." However, when Reid was told of this statement during her previous testimony, she clarified that by "dark-skinned" she meant African-American and that she was "too far away" to determine the shooter's actual complexion. It is the province of the jury to believe or disbelieve all or any part of a witness's testimony, and we

15

resolve any conflicts in the evidence in favor of the verdict.  *See Curry*, 30 S.W.3d at 406; *Sharp*, 707 S.W.2d at 614.

When the evidence is viewed in the light most favorable to the verdict, we conclude that a rational fact finder could have found beyond a reasonable doubt that appellant committed the charged offense.  We hold that the State presented sufficient evidence to establish appellant's identity as the shooter of Coleman and Houston.

We overrule appellant's second issue.

### Witness Testifying in Jail Clothes

In his first issue, appellant contends that the trial court abused its discretion when it required his alibi witness to testify in jail clothes and failed to make findings of fact and conclusions of law on the record concerning this decision.

Requiring a defendant to attend trial in jail clothing infringes upon his fundamental right to the presumption of innocence.  *Estelle v. Williams*, 425 U.S. 501, 512, 96 S. Ct. 1691, 1697 (1976); *Gibson v. State*, 233 S.W.3d 447, 453 (Tex. App.—Waco 2007, no pet.).  This constitutional consideration does not apply, however, to witnesses testifying at a hearing other than their own.  *See Gibson*, 233 S.W.3d at 453; *see also Gordon v. State*, 260 S.W.3d 205, 210 (Tex. App.— Texarkana 2008, pet. ref'd) (holding same).  The Court of Criminal Appeals has held that "it is within [the trial court's] discretion to require that witnesses be

16

dressed in [jail] uniforms and be shackled, if the circumstances so warrant." *Thompson v. State*, 514 S.W.2d 275, 278 (Tex. Crim. App. 1974); *Gordon*, 260 S.W.3d at 210; *Gibson*, 233 S.W.3d at 453. On appeal, we must determine whether the trial court abused its discretion by requiring the witness to appear before the jury in jail clothes. *Thompson*, 514 S.W.2d at 278; *Gordon*, 260 S.W.3d at 210; *Gibson*, 233 S.W.3d at 453. If we conclude that the trial court abused its discretion, we must conduct a harm analysis pursuant to Texas Rule of Appellate Procedure 44.2(a) and determine whether we believe, beyond a reasonable doubt, that the error "did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *Gordon*, 260 S.W.3d at 210–11.

For an appellate court to review the trial court's action on appeal, "the record should contain the factual matters on which the trial court's discretion was based. It must appear in the record that in exercise of its discretion the trial court had a fair knowledge and understanding of all such factual matters." *Thompson*, 514 S.W.2d at 278. The appellate record should contain the trial court's reasons for requiring the witness to testify in jail clothing, and the court should instruct the jury not to consider this fact in rendering its verdict. *See Gordon*, 260 S.W.3d at 211; *see also Thompson*, 514 S.W.2d at 278 ("The trial judge should give his reasons where objections are made to a witness testifying for a defendant in jail

17

clothing or in handcuffs and instruct the jury to not consider the restraint in assessing the proof and determining guilt.").

Here, outside the presence of the jury, defense counsel informed the trial court that he intended to call Demarco Coleman, who was in custody in the Harris County Jail and was dressed in an orange jumpsuit. Defense counsel objected to requiring Demarco to testify while in jail clothing. He stated:

> We believe that the fact that [Demarco is] in an orange jumpsuit and clearly known to be in custody would be—would create an impression of untruthfulness and would take away from the witness' testimony. I feel like if he could be dressed in street clothing, he would be put on equal footing with all other witnesses that have appeared so far, Your Honor.

The trial court responded, "That ruling is denied." The court did not make findings of fact and conclusions of law concerning this decision, and it did not explain its rationale in overruling defense counsel's objection. The trial court also did not instruct the jury, either at the time that Demarco testified or in the jury charge, that it should not consider the fact that he appeared in jail clothing when rendering its verdict. When Demarco testified, defense counsel called attention to the fact that Demarco was wearing an orange jumpsuit, and he asked Demarco whether he was in custody.[5] Demarco testified that he had previously been convicted of burglary

---

[5] There is no indication in the record that Demarco was also shackled when he testified.

of a habitation and that he was currently incarcerated because he had violated the terms of his probation.

We conclude that the trial court erred when it required Demarco to testify in jail clothing without stating its rationale for this decision on the record and without instructing the jury not to consider this fact when reaching its verdict. *See Gordon*, 260 S.W.3d at 211 ("We conclude such a rationale [requiring a witness to testify shackled and in jail clothes because it was 'sheriff's department's policy'], absent additional considerations expressly supported by the appellate record, is insufficient to support a trial court's decision to require an inmate to wear jail clothing while testifying on behalf of the accused."); *Groh v. State*, 725 S.W.2d 282, 285 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (holding that trial court erred "in allowing the witness to first appear before the jury in jail clothing, without apparent justification for doing so").

We now must determine whether we believe, beyond a reasonable doubt, that the trial court's error "did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *Gordon*, 260 S.W.3d at 210–11; *Groh*, 725 S.W.2d at 284. On direct examination, Demarco admitted that he had been previously convicted of the felony offense of burglary of a habitation and that he was incarcerated at the time of appellant's trial because he had violated the terms of his probation. This testimony would have been "a proper matter of impeachment by the State on cross-

19

examination, regardless of the witness' attire." *Gordon*, 260 S.W.3d at 211; *see also* TEX. R. EVID. 609 (permitting impeachment of witness with evidence of prior felony conviction); *Groh*, 725 S.W.2d at 285 (finding error harmless because witness testified concerning circumstances of his arrest). In *Gordon*, the Texarkana Court of Appeals reasoned that it was "inevitable" that the jury would learn that the witness was a convicted felon and had been brought from prison to testify on the defendant's behalf. 260 S.W.3d at 211. The court noted that it was "quite doubtful that [the witness'] appearance in jail clothing would have had any greater impact on the jury's credibility determination than simply hearing [the witness] himself admit to being a convicted drug dealer." *Id.*

Similarly, we conclude beyond a reasonable doubt that, because Demarco admitted to both a prior felony conviction and his subsequent violation of the terms of his probation, leading to his incarceration at the time of trial, the trial court's decision to require Demarco to testify in jail clothing did not contribute to appellant's conviction. *See* TEX. R. APP. P. 44.2(a); *Gordon*, 260 S.W.3d at 210–12; *see also Groh*, 725 S.W.2d at 284 (noting that "[n]o Texas court has found reversible error where a witness for the defense was presented to the jury in jail clothes").

We overrule appellant's first issue.

20

**Conclusion**

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Justice Sharp, dissenting in an opinion to follow.

Do Not Publish.  TEX. R. APP. P. 47.2(b).

21