**Opinion issued April 14, 2016.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00886-CR

————————————

**ANA MARIA GONZALEZ-ANGULO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1389543**

---

## MEMORANDUM OPINION

A jury convicted appellant, Ana Maria Gonzalez-Angulo, of aggravated assault of a person with whom she was in a dating relationship[1] and assessed punishment at 10 years' confinement and a $10,000 fine. In four issues on appeal,

---

[1]    TEX. PENAL CODE ANN. § 22.02(a)(1), (b)(1), § 71.0021(b) (West 2011).

appellant contends that (1) there was legally insufficient evidence that appellant poisoned the victim with ethylene glycol, as alleged in the indictment; (2) there was legally insufficient evidence that appellant and the complainant were in a "dating relationship"; (3) the trial court erred in denying appellant's motion for new trial based on newly discovered evidence; and (4) the trial court erred by allowing a State's witness to identify appellant's voice in a recorded telephone call based on two prior anonymous telephone conferences.  We affirm.

## BACKGROUND

*Events Before the Poisoning*

Appellant and the complainant, George Blumenschein, were both oncologists at MD Anderson Cancer Center, and the two doctors often collaborated on cancer research. In 2004, appellant consulted with Blumenschein about the care of a patient, but did not otherwise interact with Blumenschein until 2008, when she invited a group of physicians, including Blumenschein, to a cancer conference in Colombia, where she was born.  During one trip to Colombia, appellant and Blumenschein toured a coffee plantation where they learned that the best way to experience the flavor of coffee was to drink it black, which Blumenschein did.

Blumenschein started dating Evette Toney in 1987, but she soon moved to Boston to continue her education.  When Evette returned to Houston in 2003, she and Blumenschein resumed their relationship.  In 2007, Blumenschein and Evette

2

moved in together. Evette wanted to get married, but Blumenschein did not, so, in 2009, she bought her own house and moved out. In late 2009 or early 2010, Blumenschein asked Evette to move back in with him, and she did.

In late 2010, Blumenschein and appellant began collaborating on a potential clinical trial to target a cancer cell that involved both lung cancer, his specialty, and breast cancer, her specialty. Blumenschein wanted to learn how to write grants, and appellant volunteered to teach him. In December 2010, appellant wrote Blumenschein an email in which she said, "Love to work with you on these grants. . . P.S. I've seen how you . . . seem to really like children. I think you'd be a great dad. You should have kids." Around the same time, appellant told Blumenschein that she was getting a divorce. Appellant knew that Blumenschein was in a relationship with Evette.

In the summer of 2011, while still living with Evette, Blumenschein began an intimate relationship with appellant. Blumenschein testified that appellant initiated the relationship by sitting on his knee while they were looking at the same computer at work. She then began leaning on his shoulders and kissing him on the neck. Whenever Blumenschein protested and told appellant she was touching him too much, she said that "this is how we are in Colombia."

Nevertheless, in September 2011, while on a business trip, appellant performed oral sex on Blumenschein. Both parties referred to this development in

3

their relationship as "just sex," and that their relationship was based more on work. However, Blumenschein testified that appellant offered to "have a kid with you . . . I could move to Europe for a year and I could come back and you could be the uncle." Blumenschein declined, but the two continued their sexual relationship and were intimately involved "maybe once a month." The two only had oral sex, never sexual intercourse, which disappointed appellant because Blumenschein apparently did not consider oral sex to be real or romantic sex.

When Blumenschein's supervisor, Bonnie Glisson, questioned him about his "unseemly" relationship with appellant, Blumenschein denied having an affair with appellant. Appellant, however, did tell one of her friends, Dr. Jennifer Litton, about the affair. Appellant bought Blumenschein expensive gifts, and she often matched their luggage, jewelry, and cars. She named him in her will and as one of her executors. Another co-worker, Beverly Peeples, thought appellant was "infatuated" with Blumenschein and had a crush on him.

In December 2011, appellant was angry and questioned Blumenschein about her suspicion that he was adopting a child. Blumenschein, however, was not adopting a child, but was acting as a reference for a friend who was adopting. Blumenschein wondered how appellant knew about the adoption because the references were supposed to be confidential. Appellant's explanation was that a friend who was also adopting had seen Blumenschein's name on a list.

4

In May 2012, Evette and Blumenschein discussed starting a family. Evette soon became pregnant with twins and was placed on bedrest. While on bedrest, but with no doctor's excuse, Evette allowed her sister to drive her GlaxoSmithKline company car. Her sister then had an accident. Blumenschein shared with appellant Evette's concerns about violating GlaxoSmithKline's prohibition against non-employees driving company cars, and appellant volunteered to write Evette a fraudulent doctor's excuse. Evette gave the note written by appellant to GlaxoSmithKline, even though appellant was not her treating physician. Appellant, however, did not know about Evette's pregnancy when she wrote the "sick" note.

Evette miscarried the twins in September 2012, and shortly thereafter Blumenschein finally told appellant about Evette's pregnancy and miscarriage. Appellant's friend, Dr. Litton, noticed that appellant seemed agitated and emotional around the same time. Litton was concerned about appellant and recommended that she seek counseling.

At Thanksgiving 2012, Blumenschein and Evette went to his parents' house, and when they returned they found an anonymous letter addressed to Evette, which said, "He's interfering in my working life. She's interfering in your personal life. We should meet to discuss this . . . because things will become more complicated with Ana's impending pregnancy." The letter then suggesting meeting at

5

Starbuck's to talk. The letter misspelled appellant's name as "Anna" and Evette's name as "Yvette." Evette asked Blumenschein if he and appellant were having an affair, but Blumenschein denied it. He then called appellant to ask her about the anonymous note.

Appellant volunteered to accompany Evette to Starbucks, but everyone decided not to go. When Blumenschein showed appellant the anonymous letter she speculated that "it's just somebody trying to ruffle our feathers" because they were jealous of the work they were doing. Because the letter was not overtly threatening, Blumenschein did not call the police. He did, however, keep the letter in his black work bag.

When talking to Blumenschein about the anonymous note, appellant mentioned that earlier that month she had received a call on her direct line at the hospital, and that the caller said, "You better stop working with him or bad things are going to [happen]." When Blumenschein asked who the call was from, appellant said that no return number flashed on the phone as they usually do. When Blumenschein asked appellant why she did not call the police, appellant responded that "it's just somebody trying to mess with my head." Later, appellant mentioned a second phone call to her direct line at the hospital, again with no return number flashing, on which the caller said, "You better leave him alone. You

better stop working with him. This is a warning." Again, appellant said, "Don't worry about it."

On December 17, 2012, Blumenschein received a phone call from a co-worker, Dr. Chavez MacGregor, which made Blumenschein worry about appellant. He called appellant to ask about the information he had received from Dr. MacGregor, and appellant told him that she had been beaten and attacked by a black woman and man while going to her mailbox. She said that she was stepped on and kicked in the ribs and stomach, and that they said, "You had better stop working with him." Although Blumenschein urged appellant to call the police, she declined to do so and said her brother was going to handle it. Blumenschein did not see any injuries. A few weeks later, appellant added to the story and said that her attackers said, "Oh, and you won't be having his baby."

The next day, appellant asked if she could come over and stay with Blumenschein and Evette, and they said yes. Neither of them saw any evidence of an attack. Dr. Ana Chavez Macgregor who saw appellant the next day also did not see any bruises on appellant's face.

Appellant, Blumenschein, and Evette sat together and began to speculate about who was behind the anonymous note, phone calls, and attack. Appellant suggested that it might be Dr. Funda Meric-Bernstam, her friend at the hospital. Appellant thought Dr. Meric-Bernstam might be jealous of the work she was doing

7

with Blumenschein and said that she was going to investigate her. Appellant also said that she was going to have two bodyguards flown from Colombia.

Appellant and Blumenschein left the next day for a conference. Because he was worried about leaving Evette, Blumenschein had Evette's cousin, Malcom, an African-American, come stay with her. Upon their return to Houston, Blumenschein pushed appellant into making a police report about the attack. On that day, appellant had a bruised eye, though nobody had noticed one the day of or the day after the alleged attack. Appellant agreed to speak to police, but only if Blumenschein accompanied her. While they were together, appellant said, "You don't know what's going on in your house. . . . There was a black man staying at your house last night." When Blumenschein asked, "How in the hell do you know that?", appellant responded, "I had your house watched." Blumenschein angrily told appellant to never do that again.

In early 2013, Blumenschein and Evette decided to try again and have a child. Evette needed to have a medical procedure to improve her ability to carry a baby to term, so on January 3, Blumenschein drove Evette to the hospital in her car and left his own car at the house. He then went to work for a while before returning to the hospital to see Evette. He spent most of the next few days with Evette at the hospital, but told appellant he had been at home. Appellant became

8

angry, called Blumenschein a liar, and admitted that she knew he had been at The Women's Hospital because she had had him watched.

*Events Near the Time of the Poisoning*

On Saturday, January 26, 2013, Blumenschein returned to Houston from a conference in San Diego. Neither Evette nor appellant accompanied him on the trip. On the plane, he sat next to Dr. Mark Gilbert, another oncologist from MD Anderson. They each had wine from the same bottle and ate the same meal. Gilbert testified that Blumenschein was acting normally.

After landing in Houston, Blumenschein bought take-out from Niko Niko's restaurant, which he shared with Evette. Evette had a glass of wine, which he shared. The owner of Niko Niko's testified that no one became sick from eating their food that day. Blumenschein went to bed around 8:00 that evening. He was not sick at the time.

The next morning, Blumenschein got up, intending to go to MD Anderson, but he went to appellant's house first because she asked him to come by and get her. Appellant said that she had made breakfast and that she had a special Colombian coffee she wanted him to try. Blumenschein wanted to get to MD Anderson to start working, but appellant insisted saying, "I've got breakfast. I got this cheese bread. I got this expensive coffee. Come over. Just come over and get

9

me. Come on. Just do it. It's a lot easier." Blumenschein agreed because "[s]ometimes it's just easier to say, Fine."

Once there, Blumenschein had some cheese bread and a couple of sips of coffee, noticing that "[i]t seemed sweet." Blumenschein initiated oral sex with appellant, after which they both shared a shot of vodka from the bottle that he had given her at Christmas. Then, the two drove together in Blumenschein's car to MD Anderson.

Appellant brought a travel mug of the coffee that she had made, which Blumenschein began to drink once they arrived at the office. Blumenschein noticed that the coffee was "sickening sweet." He asked appellant what was up with the coffee, and she responded that she put Splenda in it. Blumenschein saw appellant hold the cup to her lips, but he did not know if she drank any or not. She may have taken a sip, but no more than that. Blumenschein felt it was odd that appellant put Splenda in the coffee because she knew that he usually took his black. Blumenschein took a "couple of really big gulps" from the coffee before declaring, "I just can't drink this."

Blumenschein was going to make another cup, when appellant took the travel mug and said, "I'll go make the coffee." Appellant soon returned with the travel mug, which was now only approximately ¼ full and a second mug that was "full to the brim." Appellant put both mugs down and told Blumenschein he

10

needed to finish the travel mug first because "this is expensive." Blumenschein took a couple more sips before saying, "I can't," and throwing the rest in the garbage can. Blumenschein began drinking from the second cup, which was "sweet, but not as cloyingly sweet as the first cup of coffee." He thought that she must have cut the second cup of coffee with some of the coffee from the travel mug for some reason.

Around 11 a.m., Blumenschein began to feel lightheaded, almost intoxicated. He also noticed that he was slurring his words as he tried to dictate notes. Appellant said, "Oh, you're hypoglycemic. You haven't eaten anything. Don't worry about it." Blumenschein, however, thought he might be having a stroke so he called Evette. Evette encouraged him to go to a hospital, but he continued to try to work. A co-worker who saw him thought he appeared disheveled, tired, and did not "look right."

Appellant again said, "You know, you're just hypoglycemic. We'll go to my place and get something to eat." Blumenschein and appellant left MD Anderson around 5 p.m. because they had a work dinner to attend. Once at appellant's house, she laid out a plate of sausage, cheese, and bread. While attempting to cut the sausage, Blumenschein sliced his thumb.

Appellant called her friend, Dr. Meric-Bernstam, the same doctor she had once speculated could be responsible for the anonymous letter, to come over and

look at Blumenschein's cut. Dr. Meric-Bernstam was concerned about Blumenschein's reactions and she performed a neurologic sobriety test on him. Based on his responses, she recommended that he go to an emergency room. Meric-Bernstam remembered Blumenschein complaining about the sweet coffee appellant had given him, and that appellant seemed irritated that he was making such a big deal about it.

Blumenschein and appellant had plans to attend a dinner at Feast Restaurant with Dr. Cathy Eng and Dr. Patrick Hwu to discuss a job opportunity at the University of Virginia. Blumenschein was supposed to pick up Eng, but he called and said he was running late, so she drove herself. Dr. Hwu arrived next, and Blumenschein and appellant arrived together last. At the dinner, Blumenschein kept dropping his utensils and fumbling with his Blackberry. He bumped his head on a fireplace mantle when he stood up to go to the restroom. His dinner companions asked if he had taken narcotics and suggested that he go to the hospital. He called Evette around 8 p.m. and told her, "I'm constantly dropping my utensils. I can barely walk."

After dinner, appellant assured Eng that she would take Blumenschein to a hospital. Hwu testified that he told appellant to call him if Blumenschein "gave [her] any trouble" about going to the hospital. Both Eng and Hwu were under the

impression that appellant was going to drive Blumenschein to the emergency room.

Instead, appellant drove Blumenschein back to her house. Blumenschein asked for his keys, but appellant wouldn't give them to him. Appellant tried to use his Blackberry in the bathroom, but he dropped it in the toilet. At 10:15, after being unable to reach Blumenschein because of his disabled phone, Evette called appellant. Appellant told Evette, "I have his keys and he's still sick. He's very sick . . . He can barely walk, Evette, so I took away his keys." Evette said, "Great. Keep him there. I'm on my way. I'm going to pick him up and take him to the hospital." Instead of waiting for Evette, who was on her way, appellant gave Blumenschein his keys, and he slowly drove himself to MD Anderson; appellant followed in her own car.

When Evette reached appellant's house, no one was there. She called appellant, who said that Blumenschein was driving himself to MD Anderson and she was following him. Evette asked, "Ana, why would you allow him to drive? Not only could he kill himself but someone else. Why would you allow this?" Appellant did not respond.

Once at the hospital, Blumenschein went to his office, not the ER. Evette wanted him to get to the ER immediately, but appellant said, "I don't know." About 20 minutes later, Blumenschein finally got to the ER. Once there, appellant

13

volunteered to fill out the necessary paperwork, which Evette found odd because she did not think appellant would have the necessary personal information such as Blumenschein's social security number. Evette testified that she was not aware that she was listed as Blumenschein's spouse in his medical records.

*Events After the Poisoning*

At the ER, Blumenschein was not coherent and complaining of double vision, and Dr. Gilbert was paged to evaluate his cognitive function. Doctors were initially worried about a stroke, but tests ruled that out. Instead, Dr. Amit Lahoti, a nephrologist at MD Anderson, discovered a high level of acid in his blood, which was causing kidney damage. Blumenschein was transferred to intensive care and placed on dialysis.

At some point, a nurse noticed a white sediment in Blumenschein's urine bag. Dr. Lahoti looked at a sample under the microscope and was shocked to see crystals everywhere, which was a sign of ethylene glycol poisoning. Such crystals could also cause double vision. When Lahoti went to Blumenschein's room and showed appellant a picture of the crystals, she said, "Oh, boy, looks like ethylene glycol. I've seen this quite a bit in my home country."

When Dr. Meric-Bernstam stopped by on Monday to check on Blumenschein, appellant told her about the crystals. Meric-Bernstam called her husband, a doctor, who also speculated that it might be ethylene glycol poisoning.

When Meric-Bernstam mentioned that, appellant suggested that Evette might have done it. Appellant also mentioned to Dr. Glisson, Blumenschein's supervisor, that Evette may have done the poisoning. Appellant said that Evette had a motive to poison Blumenschein because she had miscarried and they were still trying to conceive. Glisson thought this alleged motive made no sense. Appellant also admitted to Glisson that she had access to ethylene glycol in her laboratory, but she never told Glisson about the coffee she had made for appellant, and she denied having a sexual relationship with him.

Dr. Jennifer Litton spoke to appellant in the hospital on the Monday morning that Blumenschein was admitted. Appellant told her that Blumenschein was very, very sick and that they suspected ethylene glycol poisoning. Later that day, appellant told Litton that Blumenschein was upset about some coffee that she had given him with Spenda in it and that "she had to remind him that when they got to work that they were sipping out of the same to-go cup." Appellant also told Litton that she had ethylene glycol in her lab, and said, "I'm going to get in so much trouble for this." Appellant suggested that Evette was trying to frame her.

Dr. Kristin Price testified that Dr. Lahoti told her about Blumenschein's acidosis, a kidney failure symptom, so she sent an ethylene glycol test to Methodist Hospital across the street because MD Anderson was not set up to perform such a test. The test came back negative, which did not surprise Dr. Price because

15

ethylene glycol has a half-life of only 3 to 9 hours. The test did, however, contain a metabolite for ethylene glycol called calcium oxalate crystals, which would have been produced by a body breaking down ethylene glycol.

Ethylene glycol is a colorless, odorless substance with a sweet taste. It is found in antifreeze and is also commonly found in laboratories at MD Anderson. Dr. Lahoti was confident in his diagnosis of ethylene glycol poisoning. Dr. Kenneth McMartin, a toxicology professor at Louisiana State University and expert on ethylene glycol toxicity, agreed with the diagnosis and that Blumenschein's symptoms were consistent with his having ingested ethylene glycol sometime Sunday morning.

Once doctors identified ethylene glycol poisoning as the cause of Blumenshein's injury, Dr. Price began to investigate for a possible source. As part of her investigation, Price spoke to appellant. Appellant told Price that when working with appellant on Sunday she noticed that he was slurring. She thought that something was wrong, so she suggested that they go to her place so that he could take a nap. Appellant did not mention that Blumenschein had been at her house earlier that morning or that she had given him coffee. Nor did she mention that, upon returning to her house that afternoon, appellant cut his hand and that she had Dr. Meric-Bernstam come over to look at the cut. Appellant did, however,

16

claim that Evette did not like her or the fact that she and Blumenschein spent so much time together.

On several other occasions, appellant sought Price out and gave her more information about the case. She once told Price that she loved Blumenschein like a brother, and that they almost became involved, but she stopped it. A month or so later, she told Price that Blumenschein had actually been to her house the morning that he got sick and that they had shared vodka. Appellant again did not mention the coffee. On another occasion, appellant sought out Price and told her that Evette's cousin from Louisiana had beaten her. This time, she described her assailants as two men, and claimed that she had hired a private investigator to figure it out. She told Price that she did not tell police what she had discovered because her private investigator was from Colombia and she did not want to get him involved. Appellant also mentioned to Price that she was worried that Blumenschein had a possible conflict of interest with GlaxoSmithKline, Evette's employer, because Blumenschein had a research grant from that company. Whenever appellant would approach Price with more information, Price would suggest that she talk to the authorities who were now investigating the case.

While Blumenschein was still in the hospital, appellant sent Blumenschein a very angry text because she had ethylene glycol in her lab. She also said, "I'm going to be a suspect in this." Appellant also accused Evette of being responsible

for her alleged assault. On another day, appellant was visiting Blumenschein in his hospital room when he indicated that he needed his computer bag to pay some bills. Appellant volunteered to go get the bag, but when she returned, the anonymous letter to Evette, which Blumenschein had left in the bag, was missing. Blumenschein had told appellant before that the letter was in his computer bag.

Blumenschein had begun to be very suspicious of appellant, but he did not confront her because he felt very vulnerable while in the hospital and he was worried about Evette.

While Blumenschein was still in the hospital, appellant told Evette that she wanted Blumenschein to accompany her to Italy so that she could take care of him. Appellant said, "I have shared hotel rooms with him several times and I want to travel with him and take care of him." As a result of this conversation, Evette again asked Blumenschein whether he and appellant were having an affair. This time, Blumenschein admitted the affair. Evette also confronted appellant who said, "That was just sex, Evette. . . .So he used you and he used me."

On February 22, when Blumenschein was discharged, appellant offered to have him come stay at her house to recover so that she could give him IV fluids. Blumenschein refused and said he was going home with Evette, who by now knew about the affair; appellant said Evette could come too. Blumenschein and Evette declined, and Blumenschein went home with Evette to convalesce.

In March or April, appellant went out to dinner with Dr. Gilbert while they were at a conference in San Francisco. They discussed Blumenschein's poisoning at dinner, and appellant suggested that Evette might be the poisoner.

In March, Blumenschein was scheduled to attend a conference in Italy. Appellant offered to come with him and provide him with IV fluids, but he refused. Instead, he planned to take Evette. Appellant confronted Blumenschein and told him that she had looked at his United Airlines account, and that she knew that he was taking Evette. Blumenschein had to change the password on his United Airlines account.

Also in March, Blumenschein had several strange emails from appellant regarding previous emails that Blumenschein had never sent. The IT department at MD Anderson concluded that someone was tampering with Blumenschein's email account. Appellant had told several co-workers that she and Blumenschein shared email passwords. In fact, she logged into Blumenschein's email on one occasion so that she could pull up a picture of Evette to show Dr. Macgregor.

Because he was now suspicious of appellant, Blumenschein and Evette purchased a recording device, which he used to record several telephone calls with appellant. In one of the recorded telephone calls, appellant mentions that she had found an anonymous note on her front porch. She suggested that it had been there awhile because it had been exposed to the sprinkler system. Appellant said the note

said, "You finally left him alone, good." Blumenschein encouraged her to give the note to the police, and appellant finally admitted that the note was not real and she had made it up.

In April, an issue arose related to Evette's employment with GlaxoSmithKline. On April 3, someone dropped off an anonymous letter to Michelle Covard, MD Anderson's conflict-of-interest chair, suggesting that Blumenschein's grant from GlaxoSmithKline might present a conflict because Evette worked for the same company. The letter mentioned that appellant was aware of the conflict, and also misspelled her name in the same manner as the earlier anonymous note left at appellant's home did. Appellant denied sending the letter, but surveillance video showed her near the conflict-of-interest office around the time it was believed that the letter was delivered.

On April 18, Michael Rosenblum, a member of the MD Anderson Conflict of Interest Committee, received an anonymous email very similar to the letter delivered to Michelle Covard, including appellant's misspelled name. As a result of the email, Rosenblum spoke with appellant, who indicated that she had tried several times to discuss the issue with Blumenschein and that "she was unable to effect any outcome." In discussing the letter and email, Rosenblum found out that the previous month, appellant had asked Covard, hypothetically, whether an MDA faculty member could work on an industry-sponsored trial if his spouse also

worked for that company. Appellant also told Rosenblum that Evette filled out some documents upon Blumenschein's admission to the hospital indicating that she was his spouse.

On January 29, an anonymous letter similar to those sent to the conflict of interest committee was sent to GlaxoSmithKline, and was eventually forwarded to Mike DeSilva, a GlaxoSmithKline investigator, who began an investigation in April. The anonymous letter mentioned the purported conflict of interest alleging that Evette was Blumenschein's spouse, but also mentioned that Evette's sister had been in an accident in Evette's company car, and that Evette "used Dr. Blumenschain's [sic] research partner's letterhead (Dr. Gonzales) to fabricate a letter that confirmed a hospital visit at MD Anderson that did not happen[,]" because appellant was out of town on that day.

On March 8, while the GlaxoSmithKline investigation was pending, the company received an anonymous call on its ethic and compliance hotline asking why the investigation was taking so long and asking for a copy of the company's conflict of interest policy. On April 30, the caller again sought a status update from the hotline, and was told to call DeSilva, which she did. DeSilva spoke to the woman for about 10 minutes, but he asked her to call back the next day because he was in the car with his son at the time. As scheduled, the woman called back the

next day and DeSilva spoke to her for about 30 minutes.  DeSilva described the caller as a female with a Hispanic accent.

The woman was willing to continue communicating with DeSilva, but wanted to do so anonymously.  She stated that she worked with Blumenschein at MD Anderson and it was important to her that he not be made aware of her allegations.  She and DeSilva decided to refer to the anonymous caller as "Doctor" and set up an email through which he could contact her.  The caller emailed DeSilva, identifying herself as "your doctor contact at MD Anderson" and informed him that she would be leaving the hospital to take another job, but suggested that he contact "Anna Gonzales" at her MD Anderson email.  The email again misspelled appellant's and Blumenschein's names.  The caller several times urged DeSilva to call appellant saying, "Gonzalez will help you out.  We are from [neighboring] countries and we were raised the same way. She will do the right thing."  DeSilva emailed appellant a list of questions, but she never responded.

DeSilva's investigation concluded that there was no conflict of interest based on Evette's relationship with Blumenschein, but Evette was nonetheless fired because she admitted turning in the fake sick note. She told DeSilva that she did not write the doctor's note, but she did turn it in.

As a result of the poisoning, Blumenschein's kidneys function only at about 40% efficiency. He must maintain a vegetarian diet, cannot drink alcohol, and becomes easily fatigued. His life expectancy is also shortened.

On May 29, 2013, Macario Sosa, a detective for the University of Texas Police, arrested appellant as she was leaving work for the day. Appellant again blamed Evette, but when Sosa said, "You can't beat science," appellant appeared defeated and responded, "Yes, science is good."

## SUFFICIENCY OF THE EVIDENCE

The indictment in this case alleged as follows:

It is further presented that in Harris County, Texas, Ana Maria Gonzalez-Angulo, hereafter styled the defendant, heretofore on or about January 27th, 2013, did then and there unlawfully, intentionally and knowingly cause serious bodily injury to George Blumenschein, a person with whom the defendant had a dating relationship, hereafter styled the complainant, by poisoning the complainant with a deadly weapon, namely, ethylene glycol.

In issues two and three, appellant contends the State's evidence was legally insufficient to show that appellant (1) poisoned Blumenschein, or (2) was in a dating relationship with Blumenschein. We address legal sufficiency issues first because, in the event they are meritorious, we would render a judgment of acquittal rather than reverse and remand. *See Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (holding appellate courts render judgment of acquittal only when

23

trial court's ruling amounts to de facto acquittal or appellate court finds evidence was legally insufficient to support conviction).

**Standard of Review**

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). In reviewing "all of the evidence," we consider all evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). A jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). "Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**Poisoning**

Several medical experts, including Dr. Lahoti, Dr. Hail, and Kenneth McMartin, concluded that Blumenschein was poisoned with ethylene glycol, and that such poisoning occurred in the morning on the Sunday that Blumenschein fell ill.

Blumenschein testified that he was with appellant all day on the Sunday that he fell ill. Appellant insisted that he come over for breakfast because she had a

special Colombian coffee she wanted him to try.  When Blumenschein did not drink coffee before they left for the hospital, appellant put it in a travel mug.  At the office, Blumenschein refused to drink the coffee because it was too sweet.  Appellant explained that she had put Spenda in it although she knew that Blumenschein took his coffee black.  Appellant offered to make him a new cup, which she did.  However, she poured some of the special Colombian coffee in the new cup, and she insisted that he finish what was left of the original coffee first because it was expensive.

Blumenschein began showing symptoms of intoxication around 11 a.m.  Intoxication is the initial symptom of ethylene glycol poisoning.  By the time that appellant and Blumenschein went to dinner that night, his symptoms were so bad that their dinner companions, Drs. Eng and Hwu, insisted that appellant take Blumenschein to the hospital.  Instead, appellant drove him to her home and took away his keys.  However, once Evette called to check on Blumenschein, appellant immediately gave him his keys back and let him drive himself to the hospital, though he was in no condition to do so.  From this evidence, the jury could have concluded that the coffee appellant gave Blumenschein was adulterated with ethylene glycol, which is described by the experts as very sweet tasting.  The jury could have also concluded that the appellant's action in taking Blumenschein home

rather than to the hospital as she promised was a deliberate attempt to delay treatment.

Appellant points out that Blumenschein told investigators that she drank the same coffee from the same cup. Blumenschein stated that he was unable to remember much about that and that he was on pain medication at the time. Litton also testified that appellant said she "reminded" Blumenschein that they had shared the cup. At trial, Blumenschein stated that he saw appellant put the mug to her lips, but he never actually saw her swallow. The jury was entitled to believe or disbelieve whichever version of the evidence it chose, and this Court is required to view the evidence in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 319.

At the hospital, appellant filled out the paperwork for Blumenschein's admission, including information that Evette was his spouse; the same information that later served as the basis for the GlaxoSmithKline conflict of interest investigation. Indeed, the anonymous letters and emails involved in the GlaxoSmithKline investigation appear to have been drafted by the same person, and that person referenced the false note that appellant wrote for Evette, a fact known only to Evette, Blumenschein, and appellant. Evette was fired as a result of the GlaxoSmithKline investigation, and the jury could have reasonably believed that she would not have initiated an investigation that would have resulted in her

27

own firing. The GlaxoSmithKine documents also appeared to be drafted by the same person that left the note at Blumenschein and Evette's house because they contained the same misspellings. The jury could have reasonably concluded that appellant initiated the GlaxoSmithKline investigation in an effort to further cause trouble for Evette, a person that appellant repeatedly named to friends and colleagues as a probable suspect in the poisoning.

There was also evidence from Litton that, after learning that Blumenschein and Evette were trying to conceive, appellant "was more tearful and more sad than she'd ever been." Litton felt that appellant was unstable and encouraged her to seek counseling. And, there was evidence that appellant was having Evette watched. She knew that an African-American man, who turned out to be Evette's cousin, was staying with her while Blumenschein was out of town. Appellant also knew that Blumenschein had been with Evette in the hospital after her surgery, even though he had not told her about it. From this evidence, the jury could have concluded that appellant had a motive, i.e., she was angry and sad because Blumenschein and Evette were continuing with their plans to have a family.

Based on the evidence presented at trial, a rational fact finder could have found beyond a reasonable doubt that appellant poisoned Blumenschein with ethylene glycol by putting it in his coffee. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

Accordingly, we overrule issue two.

**Dating Relationship**

Appellant contends that she was not in a "dating relationship" with Blumenschein. The Penal Code does not contain a definition of "dating relationship." Rather, section 22.01(b)(2) of the Penal Code incorporates by reference section 71.0021(b) of the Family Code. *See* TEX. PENAL CODE ANN. § 22.01(b)(2). That statutory section provides that "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." TEX. FAM. CODE ANN. § 71.0021(b).

Appellant points out that Blumenschein considered the relationship to be "at least 95% work and only 5% casual sex." She also points out that Blumenschein believed that oral sex was casual and meaningless, and appellant herself said that the physical aspect of their relationship was "just sex." The record, however, shows that appellant and Blumenschein began to have sexual relations in 2011, and continued to do so until he was poisoned in 2013. The two participated in sexual acts approximately once a month. Appellant and Blumenschein frequently traveled together and shared a hotel room. Appellant admitted to several people that she and Blumenschein were having an affair. Even though the affair might not have been very "romantic," especially since Blumenschein remained in a relationship with another woman, the jury nonetheless had legally sufficient evidence to

29

rationally conclude that the relationship was "a continuing relationship of . . . [an] intimate nature." *See* TEX. FAM. CODE ANN. § 71.0021(b).

Accordingly, we overrule issue three.

## DENIAL OF MOTION FOR NEW TRIAL

In issue one, appellant contends the trial court erred in denying her motion for new trial based on newly discovered evidence.

**Background**

Appellant's motion alleged that, while preparing for trial, her attorney, Billy Belk, contacted Mary Kara Bucci, another doctor who had previously worked at MD Anderson, and had asked Bucci whether she too had been in an intimate relationship with Blumenschein. At the time, Bucci denied any romantic or intimate involvement with Blumenschein. However, after appellant was convicted, Bucci contacted Belk and told him that she had not been truthful with him earlier, and that she had, in fact, had a sexual relationship with Blumenschein before his relationship with appellant. Appellant filed a motion for new trial based on this newly discovered information.

In support of her motion, appellant filed an affidavit, in which Bucci averred that (1) she began an "occasionally romantic or intimate" relationship with Blumenschein in January 2006, when she began working at MD Anderson; (2) she spent time with Blumenschein "in a romantic context both at home in Houston as

30

well as when we were out of town on business trips"; (3) she learned about Blumenschein's relationship with Evette in 2006, and that it was her impression that "he was not happy spending time with Evette [] and did not consider her to be a future marriage partner and did not want to stay in the relationship;" (4) she was with Blumenschein on one occasion when Evette repeatedly tried to call him, but Blumenschein "would intentionally ignore her attempts to reach him, and appeared beleaguered or beaten down by her persistence;" (5) she ended her relationship with Blumenschein in January 2010 because she "was unwilling to commit to a public relationship with [Blumenschein] before he had completely broken off his relationship with Evette"; (6) that after moving to Alaska, she saw Blumenschein at a conference there, at which time he told her that he was no longer seeing Evette, and spoke about "his relationship with [appellant] in endearing terms;" and (7) that she recalled "noticing that [Blumenschein] felt a spark of interest in [appellant] as far back as 2007."

In response, the State filed an affidavit by Blumenschein, in which he acknowledged having a sexual relationship with Bucci beginning in June 2009, after Evette had moved out of his house, and that the brief relationship had ended in the fall of 2009, several months before Evette moved back in with him. Blumenschein explained that he did not recall an instance in which he refused to take Evette's calls, but explained that if he did so, "it would not be unusual that I

31

might not take the calls then or not call them back until after my meeting or work was completed." Blumenschein remembered seeing Bucci at the July 2012 conference in Alaska, but "did not tell her that my relationship with Evette was over or anything of that nature." While he mentioned appellant in regards to work, he "would not have and did not mention anything about having a personal relationship [with appellant]." Regarding the "spark of interest" in appellant that Bucci claimed to have noticed as early as 2007, Blumenschein recalled that he had spoken to appellant on the phone in 2004 regarding a patient, but he "didn't meet her (or first see her) until the fall of 2008."

In her motion, appellant contended that a new trial should be granted based on this evidence because it showed that "Blumenschein was very flirtatious and that he pursued [Bucci] under circumstances extremely similar to the ones he created with the Defendant," that Blumenschein was interested in appellant as early as 2007, and that Blumenschein was unhappy in his relationship with Evette and that the relationship was over, and he was in a new relationship with appellant.

After considering the motion for new trial based on the affidavits presented by both sides, the trial court denied appellant's motion.


**Standard of Review and Applicable Law**

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it is within the zone of reasonable disagreement. *Id.* A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.* We do not substitute our judgment for that of the trial court. *Id.*

In a motion for new trial based on newly discovered evidence, the defendant must satisfy the following elements: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003).

**Analysis**

The State argues that appellant failed to show elements 3 and 4 of the test set forth in *Wallace*. We agree. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without

the evidence." TEX. R. EVID. 401. Here, evidence that Blumenschein was a serial philanderer who targeted younger, female doctors would have little relevance to the issue of whether or not he was poisoned by appellant. Indeed, it might provide more of a motive for appellant, rather than refuting it as argued by appellant. Similarly, whether Blumenschein had several sexual affairs with co-workers from MD Anderson was not a contested issue in the case, but was, at best, a collateral issue.

Furthermore, the evidence in Bucci's affidavit was, in any respects, contradicted by Blumenschein's affidavit. The trial court was entitled to believe Blumenschein's affidavit, and disbelieve Bucci's. *Keeter v. State*, 74 S.W.3d 31, 38 (Tex. Crim. App. 2002) (holding at motion for new trial, factfinder is free to believe or disbelieve testimony of any witness); *see also Purchase v. State*, 84 S.W.3d 696, 700 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding same).

Accordingly, we overrule issue one.

## ADMISSION OF VOICE IDENTIFICATION EVIDENCE

In her fourth issue on appeal, appellant contends as follows:

The trial court erred by allowing a State's witness to identify Ana Maria Gonzalez-Angulo's voice in a surreptitiously recorded telephone call based on two prior anonymous telephone conversations during which the State's witness never learned the identity of the person with whom he was talking.

34

**Background**

During its case-in-chief, the State introduced the testimony of Mike DeSilva, a compliance investigator for GlaxoSmithKline. DeSilva testified that he had investigated conflict-of-interest complaints about Evette Toney, a GlaxoSmithKline employee, which were initiated first by an anonymous letter, then by a call from an unknown caller to the compliance hotline inquiring about the investigation of the allegations in the anonymous letter. DeSilva testified that he told the hotline personnel to have the anonymous caller phone him on his cell phone, which she later did. DeSilva's first contact with the anonymous caller was only about 10 minutes long because he was in the car with his son, but the next day he spoke to the anonymous caller for approximately 30 minutes. He described the caller as "female with a Hispanic accent." The woman stated that she worked with Blumenschein at MD Anderson, and later described herself as "your doctor contact at MD Anderson."

After testifying about his conversations with the anonymous caller, DeSilva was asked to listen to State's Exhibit 127, one of the phone calls that Blumenschein had made of his conversations with appellant. After listening to Exhibit 127, DeSilva testified that the voice on Exhibit 127, previously identified as appellant's, was the same voice as that of his anonymous caller.

Appellant argues that the in-court voice identification was tainted by an unduly suggestive pretrial identification.

**Standard of Review and Applicable Law**

"[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). In determining the admissibility of a pretrial identification, we use a two-step analysis considering (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Santos v. State*, 116 S.W.3d 447, 455 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375 (1972). Such an analysis requires us to examine the totality of the circumstances surrounding the particular case and to determine the reliability of the identification. *Conner*, 67 S.W.3d at 200; *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). A defendant must prove by clear and convincing evidence that the pre-trial identification is unreliable. *See Santos*, 116 S.W.3d at 451. If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, then the identification testimony is admissible. *Santos*, 116 S.W.3d at 451, 455–56; *see Neil*, 409 U.S. at 199, 93 S. Ct. 375. Therefore, even if the pretrial procedure is found to be impermissibly

suggestive, identification testimony nevertheless is admissible if the totality of the circumstances shows no substantial likelihood of irreparable misidentification. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet). If the totality of the circumstances indicates that a substantial likelihood of misidentification exists, then admission of the identification of the defendant amounts to a denial of due process. *See Neil*, 409 U.S. at 198–99, 93 S. Ct. at 375; *Adams*, 397 S.W.3d at 764.

A voice identification analysis differs somewhat from that of a visual identification, but the standards used to validate a visual identification are equally applicable. *See Davis v. State*, 180 S.W.3d 277, 283 (Tex. App.—Texarkana 2005, no pet.) (analyzing admissibility of voice identification); *see also Williams v. State*, 116 S.W.3d 788, 792 (Tex. Crim. App. 2003) ("'while one's voice and handwriting are, of course, means of communication,' a voice or handwriting exemplar 'is an identifying physical characteristic'") (quoting *United States v. Dionisio*, 410 U.S. 1, 6–7, 93 S. Ct. at 764 (1973)).

Appellant contends that "it was impermissibly suggestive to ask DeSilva to identify Ana Maria Gonzalez' voice as the anonymous caller by asking him to listen to a recording of her voice without providing exemplars of other females voices with Hispanic accents for comparison purposes." *See Davis*, 180 S.W.3d at 284 ("the better practice would be to provide several similar voices in the

identification procedure"). The State, however, argues that even if the voice identification was suggestive because appellant's voice was the only voice used for comparison, the evidence was nevertheless admissible because the totality of the circumstances did not indicate and substantial likelihood of misidentification.

In determining whether the is a substantial likelihood of misidentification, we consider the following five nonexclusive factors against the corrupting effect of a suggestive identification procedure: (1) the opportunity of the witness to perceive the accused; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008).

**Analysis**

Here, DeSilva had a significant amount of time to perceive the voice he identified as belonging to appellant. He spoke to the person two times on the telephone, for a total of 40 minutes. The record would support the conclusion that DeSilva, a trained investigator with 22 years' experience in law enforcement, devoted significant attention to the voice on the telephone call. DeSilva was actively investigating a claim of wrongdoing by a GlaxoSmithKine employee. In fact, after the first call, DeSilva had the anonymous caller call him back because he was unable to properly communicate with her while driving with his son in the car.

DeSilva's prior description of the voice he heard as belonging to a Hispanic female was consistent with his trial testimony identifying appellant. And, after listening to recordings of telephone calls Blumenschein made of his conversations with appellant—the same type of communication DeSilva had with the unknown caller—DeSilva identified the voice on Blumenschein's recordings—appellant's—as the same voice he heard in his 40 minute conversations with the anonymous caller. He testified that the "pitch sounded the same, the cadence, the accent; it sounded like the same person I spoke with on the phone on those two occasions." The one factor weighing against finding "no substantial likelihood of misidentification" is that DeSilva did not compare the two voices and identify appellant as the same voice he had heard on the telephone until over a year after his conversation with the anonymous caller took place.

However, after considering the totality of the circumstances and all the relevant factors, we conclude that appellant has not shown by clear and convincing evidence that the identification procedure was so impermissibly suggestive that it posed a substantial risk of irreparable misidentification. Accordingly, the trial court did not err by allowing DeSilva to identify appellant's voice as the same voice he heard when talking to the anonymous caller.

We overrule appellant's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Massengale and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).